Louise KONIK, M.D., Plaintiff,

v.

CHAMPLAIN VALLEY PHYSICIANS HOSPITAL MEDICAL CENTER, Anesthesia Associates of Plattsburgh, P.C., David T. Hannan, as President of Champlain Valley Physicians Hospital, and individually; Michael J. Moynihan, M.D., as Chief of Staff of Champlain Valley Physicians Hospital Medical Center, and individually; Salem Bayoumy, M.D., as Chief of the Department of Anesthesiology, Champlain Valley Physicians Hospital Medical Center, and individually; and John Menustik, M.D., as President, Anesthesia Associates of Plattsburgh, P.C., and individually, Defendants.

No. 79-CV-217.

United States District Court,
N.D. New York.

Feb. 28, 1983.

Opinion on Motions for Directed Verdict
March 2, 1983.

Tobin & Dempf by Michael L. Costello, David Ruff, Albany, N.Y., for plaintiff.

Fitzpatrick, Bennett, Trombley, Lennon & Owens by James A. Fitzpatrick, Edward Trombley, Plattsburgh, N.Y., for defendants Champlain Valley Physicians Hosp. Medical Center, David T. Hannan, Michael J. Moynihan, M.D., and Salem Bayoumy, M.D.

Carter, Conboy, Bardwell, Case & Blackmore by James S. Carter, Susanna Fisch, Albany, N.Y., for defendants Anesthesia Associates of Plattsburgh, P.C., and John Menustik, M.D.

MEMORANDUM–DECISION and ORDER

MINER, District Judge.

## I

Plaintiff, an anesthesiologist, has commenced this action for declaratory, injunctive and monetary relief against the following defendants: Champlain Valley Physicians Hospital Medical Center (hereinafter the "hospital"), its President, David T. Hannan, its Chief of Staff, Michael J. Moynihan, Anesthesia Associates of Plattsburgh, P.C. (hereinafter "AAP"), its President, John Menustik and the hospital's Chief of Anesthesiology, Salem Bayoumy. Plaintiff's complaint contained claims for relief under the Sherman and Clayton Antitrust Acts, 15 U.S.C. §§ 1 et seq., the Civil Rights Act of 1871, 42 U.S.C. § 1983 and the Medicare Act, 42 U.S.C. §§ 1395 et seq. Subject matter jurisdiction for the various federal claims was predicated upon 28 U.S.C. §§ 1331(a), 1343(3) and 1337. Additionally, the complaint set forth four claims for relief invoking this Court's pendent jurisdiction, and, finally, treble damages, compensatory damages and punitive damages were sought.

On July 19, 1979, the Honorable James T. Foley, U.S.D.J., granted defendants' motion to dismiss as to the civil rights, medicare and state pendent claims and denied defendants' motion to dismiss as to the antitrust claims. Plaintiff's cross-motion for preliminary injunctive relief was denied and dismissed. See Konik v. Champlain Valley Physicians Hospital Medical Center, 79–CV–217 (N.D.N.Y. July 19, 1979). The only claims remaining, then, are plaintiff's antitrust claims.[1]

Before this Court is defendants' motion to dismiss the antitrust claims for lack of subject matter jurisdiction and for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6), and, in the alternative, for summary judgment pursuant to Fed.R. Civ.P. 56(b). Also before this Court is plaintiff's cross-motion for partial summary judgment pursuant to Fed.R.Civ.P. 56(a).

## II

Plaintiff is a physician duly licensed to practice medicine in the State of New York. She has held her license since 1958 and her specialty is anesthesiology. On January 1, 1961, Dr. Konik was appointed to the staff of the predecessor of the defendant, Champlain Valley Physicians Hospital Medical Center, and has remained on the general medical staff of the defendant hospital over the last twenty-two years. (Affidavit of Louise Konik, M.D., sworn to October 27, 1982, ¶ 8; hereinafter "Konik Affidavit").[2] Indeed, Dr. Konik has served as Chief of the Anesthesiology Department at the hospital.

In June, 1969, the anesthesiologists serving the defendant hospital subscribed to a document that stated their intent to form a professional group for the practice of anesthesiology in Plattsburgh. Plaintiff herself signed this document. (Affidavit of David T. Hannan, sworn to April 9, 1979, Ex. A; hereinafter "Hannan Affidavit"). Moreover, due to the expansion of the hospital and the increase in the need for their professional services, the hospital encouraged the five staff anesthesiologists to "enter a group practice arrangement." (Hannan Affidavit, Ex. C). A formal partnership agreement, reciting the wishes of the hospital, was executed by the anesthesiologists on January 1, 1971. (Hannan Affidavit, Ex. B). During this early existence of the anesthesiology group, however, the hospital did not believe that a formal contract between itself and the group was required since the scheduling of services through the

---

1. The Court refused to grant defendants' motion as to the plaintiff's first "cause of action," the antitrust claims, in part because there was an insufficiency of discovery to form a basis for summary judgment on the contested jurisdictional issue.

2. Dr. Konik's latest appointment occurred on January 18, 1982, when the hospital's board of directors approved her appointment to the "Attending Medical Staff" and granted her "Senior Privileges in Anesthesiology." (Konik Affidavit, ¶ 9, Ex. 3).

group "would preempt the available caseload." (Hannan Affidavit, Ex. D).

There is no mention of fee arrangements in the anesthesiologists' partnership agreement. However, there is some evidence that a billing fee of $35.00 was collected by the hospital for anesthesia services during obstetrical vaginal delivery, that quarterly transfers of the accumulated fees were made to the group, and that such an arrangement was the product of an agreement between the hospital and the anesthesiologists as a group. (Hannan Affidavit, Ex. F).

During the year 1973, the anesthesiology group established a professional corporation, allegedly for administrative and professional reasons. This is the professional corporation which in this action constitutes the defendant AAP (Konik Affidavit, ¶ 25). Dr. Konik continued to be affiliated with AAP until August, 1978. (Id., ¶ 27).

It is not entirely clear from the record whether plaintiff chose to withdraw from the AAP as a consequence of the hospital's decision to require a formal contractual undertaking between itself and the anesthesiologists as a condition to the delivery of those services, or, whether plaintiff withdrew from the group for internal and personal reasons other than the contractual clauses plaintiff now finds to be objectionable.[3] In any event, the hospital's stated reason for the contractual arrangement was to "provide community anesthesiology services sufficient in quantity and quality to meet the ongoing surgical and obstetrical demands of its patients." (Hannan Affidavit).

Plaintiff alleges that at this time she was advised that she would not be permitted any access to the surgical suites at the hospital unless she agreed "to abide by and become a signatory to the contemplated exclusive contract between the hospital and defendant, AAP." (Konik Affidavit, ¶ 30). However, on August 1, 1978, an offer was made to Dr. Konik on behalf of the hospital and its administration, to allow her to practice at the hospital and deliver anesthesia services for a period of time up to September 1, 1978, as an independent physician on the staff practicing as "a solo physician." (Konik Affidavit, ¶ 31, Exs. 5, 6).

During this period of time, plaintiff maintains, there was no disruption in anesthesia coverage at the hospital, the assignment of anesthesia services was effectively handled by the Department of Anesthesiology, she effectively competed with AAP in delivering anesthesia services to the hospital, and that this arrangement "proceeded smoothly ... with no problems whatsoever," in part because she was obligated to abide by the bylaws of the General Medical staff of the hospital as well as all of the rules, regulations and bylaws of the Department of Anesthesiology, all of which allegedly provide that physicians must furnish necessary services when required.[4] (Id., ¶ 33). Plaintiff further maintains that on September 1, 1978 defendant President Hannan ordered defendant Bayoumy, then Chief of Anesthesiology, to remove Dr. Konik from the anesthesia rotation schedule. As a consequence, plaintiff has not engaged in the active practice of her profession at the defendant hospital since September, 1978.

Between September and November, 1978, the hospital and plaintiff attempted to

3. Dr. Konik seems to maintain that she discontinued her "affiliation with the defendant, AAP, in order to practice as an independent physician with Senior Privileges in Anesthesiology at defendant, [hospital]." (Konik Affidavit, ¶ 28). Dr. Konik, however, also hints that she resigned from AAP since "discussions and negotiations had been undertaken [at the time of her departure] between the defendant, [hospital], and defendant, AAP, for purposes of entering into an exclusive contract [between the hospital and AAP] ... whereby [AAP] would have the exclusive franchise for providing anesthesia services at the [hospital]." (Konik Affidavit, ¶ 29).

4. Plaintiff also contends that no proceedings in accordance with the hospital bylaws have ever been instituted regarding her conduct, either professionally, or, as a consequence of her withdrawal from AAP. This contention is uncontroverted.

reach an accommodation regarding the content of the agreements which the hospital allegedly required as a condition of the delivery of anesthesiology services to its patients. One of the proposed agreements is alleged to have provided for a uniform posted fee schedule, to which the plaintiff objected. Dr. Konik signed and submitted a counter proposal, dated September 29, 1978, with a provision, originally contained in the earlier August 31, 1978 tripartite agreement subscribed to by the hospital and AAP but unsigned by plaintiff, that provided that the fees charged will be no greater than those charged by other anesthesiologists for similar work situations in upstate New York. (Hannan Affidavit, Ex. G). This counter proposal also sought to reserve to the plaintiff all legal rights against the defendants. The defendant hospital and the defendant AAP did not sign this proposal.[5]

Plaintiff states that she was "forced" to sign and submit this counter proposal "to restore my access to the surgical suites of the defendant hospital in order that I could continue delivering anesthesia services," lest professional inactivity result in a deterioration of her skills. (Konik Affidavit, ¶ 35). Dr. Konik further states that she will not be coerced into entering into any contract, similar to the August 31, 1978 agreement, regulating her fee schedule and that, as a competent practitioner of 18 years, she will not have her status reviewed every six months as provided for in the contract. She asserts that the matter of a due process violation (denial of the use of hospital facilities for delivery of anesthesiological services), in addition to the contractual impasse, was brought to the attention of the State and County Medical Societies at a November 13, 1978 meeting between the principals and representatives of those societies. (Konik Reply Affidavit).

A new proposal was submitted by defendants, attempting to incorporate the clauses desired by plaintiff and reach an accommodation as to the disputed reservation of legal rights. (Hannan Affidavit, Ex. I). Plaintiff apparently refused to sign this compromise agreement. Therefore, plaintiff claims, the original tripartite agreement (hospital-AAP-plaintiff) of August 31, 1978, signed only by the defendants hospital and AAP, is presently in effect.[6]

### III

Plaintiff's remaining claim, entitled "First Cause of Action," purports to set forth claims under 15 U.S.C. §§ 1, 2, 14, 15 and 26. Under the heading of "First Cause of Action," two individual "counts" are pleaded, alleging violations of 15 U.S.C. §§ 1 and 2. A liberal reading of plaintiff's antitrust averments reveals that the gravamen of her § 1 claims are premised upon the *per se* violations of price-fixing, *United States v. Trenton Potteries Co.,* 273 U.S. 392, 398, 47 S.Ct. 377, 379, 71 L.Ed. 700 (1927), and group boycotts or concerted refusals to deal, *Klor's, Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 212 and n. 5, 79 S.Ct. 705, 709 and n. 5, 3 L.Ed.2d 541 (1959) (Complaint, ¶¶ 40, 41). Plaintiff's partial summary judgment motion is specifically predicated upon a showing of an illegal tying arrangement (exclusive contract), horizontal price fixing, vertical price fixing, illegal group boycott, and a violation of the essential facilities doctrine. (Notice of Motion by Plaintiff for Partial Summary Judgment, dated October 27, 1982).

---

**5.** Paragraph 6 of the September 29th agreement provides, "[t]he execution of this Memorandum of Understanding shall not be deemed a waiver of any cause of action of the party of the third-part [Dr. Konik] heretofore existing against any other party to this agreement." Plaintiff contends that the reason AAP and the hospital refused to sign this agreement was that she intended to challenge the legality of this and prior "exclusive" agreements. (Konik Affidavit, ¶ 36).

**6.** It is not disputed that the August 31st agreement is still in effect, at least between defendants hospital and AAP. However, it is the effect and scope of the contract that is at the very heart of the dispute at bar. The agreement is provided in Appendix A, *infra,* for the reader's convenience.

Defendants have asserted in their summary judgment motion[7] an array of defenses against plaintiff's antitrust claims, including: (1) the lack of a showing of the existence of an exclusive contract, *Capili v. Shott*, 620 F.2d 438 (4th Cir.1980); (2) the failure to demonstrate a conspiracy or a combination in restraint of trade or commerce among the states; and (3) the lack of subject matter jurisdiction under the Sherman Act, *Yellow Cab Co. of Nevada v. Cab Emp. Automotive*, 457 F.2d 1032 (9th Cir. 1972); *Cardio-Medical Associates, Ltd. v. Crozer-Chester Medical Center*, 536 F.Supp. 1065 (E.D.Pa.1982). As a threshold matter, this Court shall consider the jurisdictional question.

## JURISDICTIONAL PREREQUISITES UNDER THE SHERMAN ACT

■ The jurisdictional requirement under the Sherman Act may be satisfied by showing that the challenged activity either occurred in interstate commerce, or, though wholly local in nature, has an effect on interstate commerce. *McLain v. Real Estate Board, Inc.*, 444 U.S. 232, 100 S.Ct. 502, 62 L.Ed.2d 441 (1980). "It can no longer be doubted ... that the jurisdictional requirement of the Sherman Act may be satisfied under either the 'in commerce' or the 'effect on commerce' theory." *Id.* at 242, 100 S.Ct. at 509. It is also well established that the jurisdictional issue in antitrust cases involving the denial of hospital staff privileges or access to hospital facilities may be determined under the "effect on commerce" test. *Crane v. Intermountain Health Care, Inc.*, 637 F.2d 715 (10th Cir.1980). *See also Mishler v. St. Anthony's Hospital Systems*, 694 F.2d 1225 (10th Cir.1982).

■ To establish jurisdiction under the "effect on commerce" test plaintiff need *not* show that the defendants' challenged conduct *itself* had a substantial effect on interstate commerce. "If establishing jurisdiction required a showing that the unlawful conduct itself had an effect on interstate commerce, jurisdiction would be defeated by a demonstration that the alleged restraint failed to have its intended anticompetitive effect. This is not the rule of our cases."[8] *McLain v. Real Estate Board of New Orleans, supra*, 444 U.S. at 243, 100 S.Ct. at 509. The plaintiff, then, must establish that there exists a sufficient nexus between the challenged activity and interstate commerce so that it can be said "as a matter of practical economics" there is "a not insubstantial effect on the interstate commerce involved." *Id.* at 246, 100 S.Ct. at 511. In determining jurisdiction, there is no talismanic test. "Rather, jurisdiction must be determined using a case-by-case analysis of the relevant economic facts." *Heille v. City of St. Paul, Minnesota*, 671 F.2d 1134, 1136 (8th Cir.1982). Moreover, "the impact defendant's professional activities may have upon interstate commerce ... is a question of fact ...." *Williams v. St. Joseph Hospital*, 629 F.2d 448, 454 (7th Cir.1980).

Here, it is conceded that the plaintiff, Dr. Konik, has been denied use of the facilities at the defendant hospital for delivery of anesthesia services because she failed to sign a contract for the rendering of such services. Dr. Konik alleges that this denial of access by the named defendants violated the antitrust laws under the Sherman Act.

■ In maintaining that the jurisdictional requirement of the Sherman Act has been met, Dr. Konik presents allegations in her complaint, accompanied by certain proof in depositions and affidavits, that:

1. plaintiff treated patients who traveled in interstate commerce;

---

7. Since the Court is considering material outside the pleadings, defendants' motion shall be treated solely as one for summary judgment.

8. "Nor is jurisdiction defeated in a case relying on anticompetitive effects by plaintiff's failure to qualify the adverse impact of defendant's conduct. *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 123–25 [89 S.Ct. 1562, 1576–77, 23 L.Ed.2d 129] (1969); *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 265–266 [66 S.Ct. 574, 580, 90 L.Ed. 652] (1946)." *McClain v. Real Estate Bd. of New Orleans, supra*, 444 U.S. at 243, 100 S.Ct. at 510.

2. plaintiff administered and prescribed a substantial quantity of pharmaceutical drugs and anesthesia supplies which were manufactured out of state;

3. a substantial portion of the fees charged by plaintiff was paid by out of state, third-party insurers and payers, including the federal government;

4. defendants treat a substantial number of patients who travel in interstate commerce;

5. the defendants purchase, administer, prescribe, and use drugs and supplies manufactured out of state;

6. defendants receive a substantial amount of revenues from third-party, out of state insurers and payers, including the federal government;

7. the defendant hospital has a direct link with interstate commerce by virtue of its contractual training programs for the medical students of the University of Vermont Medical School and the undergraduates at the University of Vermont; and

8. the defendants' activities are allegedly designed to prevent plaintiff and others from competing with defendants in the delivery of anesthesia services at defendant hospital.[9]

This Court agrees with plaintiff that these allegations do fall within the "effect on commerce" test. *See Hyde v. Jefferson Parish Hospital District No. 2,* 686 F.2d 286 (5th Cir.1982); *Crane v. Intermountain Health Care, supra; Everhart v. Jane C. Stormont Hospital,* 1982–1 Trade Cases ¶ 64, 703 (D.Kan.1982); *Malini v. Singleton & Associates,* 516 F.Supp. 440 (S.D.Tex.

1981); *Williams v. Kleaveland,* 534 F.Supp. 912 (W.D.Mich.1981); *Robinson v. Magovern,* 521 F.Supp. 842 (W.D.Pa.1981); *Santos v. Columbus-Cuneo-Cabrini Medical Center,* 1982–1 Trade Cases ¶ 64, 498 (N.D. Ill.1981), *remanded on other grounds,* 684 F.2d 1346 (7th Cir.1982); *Stone v. William Beaumont Hospital,* 79–74212 (E.D.Mich. 1981).[10]

In the present case, defendants have moved for summary judgment in part, claiming that the plaintiff has failed, as a matter of law, to establish the jurisdictional elements of a Sherman Act claim. Defendants rely heavily on a recent case from the Eastern District of Pennsylvania, *Cardio-Medical Associates, Ltd. v. Crozer-Chester Medical Center,* 536 F.Supp. 1065 (E.D.Pa. 1982). It is contended that *Cardio-Medical* is authority for the following two propositions: (1) in analyzing the nexus between defendants' challenged activities in interstate commerce, the courts must look only to the plaintiff's interstate commerce activities; and (2) the treatment of patients who travel in interstate commerce, the purchase of supplies from out of state sources and the receipt of revenues from out of state third-party insurers, do not satisfy the interstate commerce requirement of antitrust law. Neither proposition, this Court believes, is an accurate statement of the current state of the law in this area.

As to the first proposition, the court based its holding solely on *Nara v. American Dental Association,* 526 F.Supp. 452 (W.D.Mich.1981). In *Nara,* a dentist's membership in defendant's national organization was suspended as a result of plain-

---

**9.** *See* Complaint, ¶ 28; Defendants' Admissions.

**10.** The above cases all involve physicians being denied staff privileges or access to defendant hospital's facilities as a result of alleged exclusive contractual arrangements among the named defendants. The underlying rationale of these cases is that defendants' activities affect interstate commerce because they retard competition. This retardation affects interstate commerce in the following ways: first, by denying to physicians the opportunity to compete, prices will invariably stabilize at some fixed rate and this will affect the amount of

payments made by out of state, third-party insurers. Allowing these plaintiff-physicians privileges and access will provide patients and third-party insurers the benefits of free and open competition. This in turn will affect the amount of payments made by out of state, third-party insurers. Second, the competition that will be generated by permitting physicians staff privileges and access will affect the volume of out of state patients treated and the volume of the out of state purchases of supplies. This point was specifically addressed in *Malini v. Singleton and Associates, supra.*

tiff's violation of the Michigan Dental Code. Plaintiff alleged that this action by the American Dental Association violated the antitrust laws under the Sherman Act, and attempted to establish the jurisdictional element by claiming that the defendant organization was involved in interstate commerce. The *Nara* court rejected this approach.

However, *Nara* is factually distinguishable from the above cited denial of privileges and access cases which, as stated, held that *both* the plaintiffs' and defendants' interstate activities are to be analyzed in meeting the "effect on commerce" jurisdiction test. In *Nara,* the defendant was a national organization that did not provide dental services nor compete with individual practitioners. Moreover, the suspension of one member of the Association for misconduct did not effect competition within the dental profession. As noted earlier, the underpinning of the denial of privileges and access cases is the fact that the defendants' challenged activities have the effect of eliminating competition which in turn affects instate commerce activities of treating patients who travel in interstate commerce, purchases of out of state supplies, and receipt of revenue from out of state third party insurers. This aspect of those denial cases is missing in *Nara.* Thus, viewed in light of the anticompetitive aspect of the denial cases, there does not exist in *Nara* a logical nexus between the defendant's challenged activities and interstate commerce. In other words, the *Nara* court, out of necessity, had to analyze the jurisdictional issue based solely on plaintiff's interstate commerce activities. Therefore, the *Cardio-Medical* court incorrectly relied on the *Nara* case to support the proposition that a court must look only to plaintiff's interstate commerce activities to establish the nexus between the challenged activities and interstate commerce.[11]

In addition, the second proposition enunciated in *Cardio-Medical,* first announced in *Spears Free Clinic and Hospital v. Cleere,* 197 F.2d 125 (10th Cir.1952), that the treatment of patients who travel in interstate commerce, the purchase of supplies from out of state sources and the receipt of revenues from out of state third party insurers, do not satisfy the interstate commerce requirement of the Sherman Act, is equally without merit.[12] The Supreme Court, in *Hospital Bldg. Co. v. Rex Hospital Trustees,* 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976), rejected implicitly the idea that there cannot be a "substantial effect" on interstate commerce if coconspirators "succeed[ed] in blocking ... petitioner's purchases of out-of-state medicines and supplies as well as its revenues from out-of-state insurance companies ...." 425 U.S. at 744, 96 S.Ct. at 1852. The "substantial effect" test, therefore, may be satisfied upon *any* showing that there existed an "unreasonable burden on the free and uninterrupted flow of interstate commerce." *Id.* at 746, 96 S.Ct. at 1853.

Moreover, the Third Circuit, which includes the *Cardio-Medical* Eastern District of Pennsylvania court, expressly rejected the *Spears* rationale in *Doctors, Inc. v. Blue Cross of Greater Philadelphia,* 490 F.2d 48 (3d Cir.1973). "[T]he [*Spears*] opinion even when it was written placed primary reliance on a series of cases that were no longer valid .... As a result, the reason-

---

11. In addition, *Cardio-Medical* also relied upon *Hahn v. Oregon Physicians' Service,* 508 F.Supp. 970 (D.Or.1981) to support this proposition. This Court notes that the Ninth Circuit recently overturned the district court's decision in *Hahn. Hahn v. Oregon Physicians' Service,* 689 F.2d 840 (9th Cir., October 5, 1982). Specifically, the Ninth Circuit held that the trial court erred when it determined the jurisdiction issue solely on the plaintiff's interstate commerce activities, since "jurisdiction may also be established directly by the defendants' activities." *Id.*

12. The *Spears* rationale has been relied upon and followed in a number of cases. *See Wolf v. Jane Phillips Episcopal-Memorial Medical Center,* 513 F.2d 684 (10th Cir.1975); *Riggall v. Washington County Medical Society,* 249 F.2d 266 (8th Cir.1957); *Capili v. Shott,* 487 F.Supp. 710 (S.D.W.Va.1978), *aff'd,* 620 F.2d 438 (4th Cir.1980); *Nankin Hospital v. Michigan Hospital Service,* 361 F.Supp. 1199 (E.D.Mich.1973).

ing of the opinion rested on flawed grounds when it was issued in 1952." 490 F.2d at 52. The court further held, in contravention of the *Cardio-Medical* holding, that the interstate commerce allegations of treating patients from out of state sources, of the trafficking in out of state goods, and of the receipt of revenues from out of state sources were sufficient to establish jurisdiction under the Sherman Act.[13] *Id.* at 53.

Therefore, the *Cardio-Medical* jurisdictional holding appears to be contrary to the great weight of authority, and this Court declines to follow it. Consequently, the Court finds that plaintiff here has succinctly and sufficiently satisfied the Sherman Act's jurisdictional requirements.

## PLAINTIFF'S PER SE ARGUMENTS

Defendants argue that the rule of reason is the standard to be exclusively applied in this case. This Court disagrees.

Section 1 of the Sherman Act provides that "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states ... is declared to be illegal." 15 U.S.C. § 1. A literal reading of this section would give rise to a finding of violation in every commercial contract that affects interstate commerce. *National Society of Professional Engineers,* 435 U.S. 679, 687–88, 98 S.Ct. 1355, 1363, 55 L.Ed.2d 637 (1978); *Standard Oil Co. v. United States,* 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). Consequently, the Supreme Court has read the so-called "rule of reason" into the Sherman Act. *Arizona v. Maricopa County Medical Society,* —— U.S. ——, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982); *Standard Oil Co. v. United States, supra.*

■ Under the "rule of reason," only unreasonable restraints of trade are forbidden. A restraint of trade is deemed unreasonable where the anti-competitive effects

outweigh the procompetitive effects of the challenged activity. *National Society of Professional Engineers, supra,* 435 U.S. at 688–92, 98 S.Ct. at 1363–65. Certain business combinations, however:

because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use. This principle of per se unreasonableness not only makes the type of restraints which are proscribed by the Sherman Act more certain to the benefit of everyone concerned, but it also avoids the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable .... Among the practices which the courts have heretofore deemed to be unlawful in and of themselves are price fixing ... division of markets ... group boycotts ... and tying arrangements.

*Northern Pacific Ry. Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958).

Despite the Supreme Court's strong endorsement of the use of the per se rule in cases involving the above-mentioned restraints of trade, some lower courts have been hesitant to apply this rule in cases where professionals in the health care field are involved. *See Everhart v. Jane C. Stormont Hospital, supra; Robinson v. Magovern, supra.* This argument has recently been rejected by the Supreme Court in *Arizona v. Maricopa County Medical Society, supra.*

■ In *Maricopa County,* the defendants, like the defendants in the instant case, argued that courts "should not apply the per

---

**13.** Additionally, the Tenth Circuit has cast doubt on the validity of its holding in *Wolf v. Jane Phillips Episcopal-Memorial Center, supra.* "[T]o the extent *Wolf* can be read as rejecting, as a matter of law, the possibility that an interstate flow of people seeking a

purely local service can have a substantial effect on interstate commerce, it is no longer good law in light of *McLain.*" *Crane v. Intermountain Health Care, Inc., supra,* 637 F.2d at 726 n. 4.

se rule ... because the judiciary has little antitrust experience in the health care industry." —— U.S. at ——, 102 S.Ct. at 2476, 73 L.Ed.2d at 62. However, the Court noted that "[this] argument quite obviously is inconsistent with *Socony-Vacuum.* In unequivocal terms, we stated that, '[w]hatever may be its peculiar problems and characteristics, the Sherman Act, so far as price-fixing agreements are concerned, establishes one uniform rule applicable to all industries alike.' " *Id.,* citing *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 222, 60 S.Ct. 811, 843, 84 L.Ed. 1129 (1940). The Court also rejected the argument that the per se rule must be rejustified for every industry that has not been subject to significant antitrust litigation. 73 L.Ed.2d at 63. Therefore, although *Maricopa County* involved only allegations of horizontal price-fixing, this Court agrees with plaintiff that other per se violations, including group boycotts and tying arrangements, apply equally to the health care profession. *See Hyde v. Jefferson Parish Hospital District No. 2, supra.* The Court, then, will deal with plaintiff's per se theories seriatim.

1. Illegal Tying Arrangement.

Plaintiff's first per se argument is that the agreement between defendants hospital and AAP constitutes an illegal tying arrangement. A tying arrangement is "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product . . . ." *Northern Pacific Ry. Co. v. United States,* 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). The Supreme Court has recognized that "the vice of tying arrangements lies in the use of economic power in one market to restrict the competition on the merits in another regardless of the source from which the power is derived and whether the power takes the form of a monopoly or not." *Id.* at 11, 78 S.Ct. at 521.

■■■■ However, not all tying arrangements are proscribed by the Sherman Act.

A tying arrangement is a per se violation of the Act when it exhibits the following four characteristics:

1. two separate products, the tying product and the tied product;

2. sufficient market power in the tying market to coerce purchase of the tied product; [14]

3. involvement of a not insubstantial amount of interstate commerce in the tied market; and

4. anticompetitive effects in the tied market.

*Bob Maxfield, Inc. v. American Motors Corp.,* 637 F.2d 1033, 1037 (5th Cir.1981).

Plaintiffs contend that a tying arrangement exists here because the users of the hospital's operating rooms (the tying product) are also compelled to purchase the hospital's chosen anesthesia service (the tied product). Thus, it is contended that we are dealing with two distinct services which a buyer should be able to purchase separately. In support of this per se tying arrangement argument, plaintiff cites *Hyde v. Jefferson Parish Hospital District No. 2, supra.*

In *Hyde,* a plaintiff anesthesiologist was denied staff privileges at a New Orleans hospital because that hospital had an exclusive contract with a professional medical corporation for the provision of anesthesia services. Plaintiff filed suit against the hospital, alleging that the exclusive contract between the hospital and the professional corporation constituted a per se illegal tying arrangement. The district court refused to apply the per se rules of antitrust in this situation and granted judgment to the defendant under the "rule of reason." *Hyde v. Jefferson Parish Hospital District No. 2,* 513 F.Supp. 532 (E.D.La. 1981).

The Court of Appeals for the Fifth Circuit reversed the district court and held that the per se rules of antitrust law apply in cases involving professionals in the

---

**14.** Indeed, the Second Circuit has stated that "actual coercion by the seller that in fact forces the buyer to purchase the tied product is an indispensible element of a tying violation." *Unijax, Inc. v. Champion Intern, Inc.,* 683 F.2d 678, 685 (2d Cir.1982); *Yentsch v. Texaco, Inc.,* 630 F.2d 46, 57 (2d Cir.1980).

health-care industry and that the exclusive contractual arrangement between the hospital and the professional corporation constituted a per se illegal tying arrangement. Moreover, the court specifically rejected the trial court's finding that plaintiff had failed to demonstrate that the hospital dominated the market for its services. · *Hyde v. Jefferson Parish Hospital District No. 2, supra,* 686 F.2d at 289.

■■■■ However, the starting point, the genesis, of the *Hyde* holding was that there existed an exclusive contract, a point that is hotly contested here. "This action was occasioned by the fact that the hospital had an exclusive contract with . . . a professional medical corporation, to provide anesthesia services." *Id.* at 287. Without the showing of an exclusive contract, which is at the core of this action and is obviously the gravamen of all of plaintiff's antitrust theories, the existence of a tying arrangement remains problematical. Therefore, summary judgment on this issue should be denied.[15]

15. Even if plaintiff was to prove the existence of an exclusive contract, there exist many attendant problems with the tying arrangement theory, "market power" for one. Plaintiff is quite correct in contending that it does not have to prove that the hospital totally dominated the market. All that plaintiff must show is that the hospital possessed "sufficient economic power to impose an appreciable restraint on free competition in the tied product . . . ." *Northern Pacific Ry. Co. v. United States, supra,* 356 U.S. at 11, 78 S.Ct. at 521.

As a first step, in demonstrating "sufficient market power," plaintiff must demonstrate the relevant geographic market for the hospital's services. Then it must be shown that, within that geographic market, the seller (here hospital) "has the power . . . to raise prices or to require purchasers to accept burdensome terms that could not be exacted in a completely competitive market. In short, the question is whether the seller has some advantage not shared by his competitors in the market for the tying product." *United States Steel v. Fortner Enterprises,* 429 U.S. 610, 620–21, 97 S.Ct. 861, 867–68, 51 L.Ed.2d 80 (1977); *International Salt Co. v. United States,* 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947); *IBM Corp. v. United States,* 298 U.S. 131, 56 S.Ct. 701, 80 L.Ed. 1085 (1936).

There exist many problems and pitfalls in establishing the above two factors. First, there is a serious question whether the relevant market area can be sliced so small as to embrace a single hospital. The district court in *Hyde* held that the relevant geographic area included an area of at least twenty hospitals, and therefore concluded that if both patient and surgeon are free to go to any one of a large number of competent institutions, the hospital does not possess the power to force the tied product upon consumers. *Hyde v. Jefferson Parish Hospital District No. 2, supra,* 513 F.Supp. at 540. Other courts have accepted this reasoning. *See Santos v. Columbus-Cuneo-Cabrini Medical Center,* 684 F.2d 1346 (7th Cir.1982); *Harron v. United Hospital Center, Inc.,* 522 F.2d 1133 (4th Cir.1975) (per curiam), *cert. denied,* 424 U.S. 916, 96 S.Ct. 1116, 47 L.Ed.2d 321 (1976).

However, the Fifth Circuit in *Hyde* took note of several market imperfections in the health care industry. "First, the prevalence of third party payment of bills eliminates a patient's incentive to compare the relative cost effectiveness of competing hospitals. A second market imperfection is the lack of complete information regarding the quality of medical care offered." *Hyde v. Jefferson Parish Hospital District No. 2, supra,* 686 F.2d at 290. Therefore, the Court concluded, patients tend to choose hospitals by location rather than price or quality, which means that the geographic market area apparently may subsume only an individual hospital.

Plaintiff here alleges that the defendant hospital is the *only* major facility in a tri-county service area, and moreover, it is the only hospital facility in Clinton County, New York. Plaintiff further alleges that patients flock to the hospital due to its size, location, reputation, scope of services offered, and also due to the fact that it is the area's only referral hospital. (Konik Affidavit, Ex. 8–12). If plaintiff is able to prove these allegations at trial, it is unnecessary for this Court to enter the fray concerning whether the relevant market area may be limited to a single hospital since the allegations here distill down to one contention that there exists *no* relevant competition among hospitals in the area. However, even if plaintiff fails to prove the above, a relevant market area may still be demonstrated, this Court believes, by showing that patients tend to choose hospitals by location, rather than by price or quality.

As for the second prong of demonstrating "sufficient market power," that is, that within the relevant market area it must be shown that the hospital is able to coerce its purchasers of services into accepting "burdensome terms [here exclusive contract] that could not be exacted in a completely competitive market," *United States Steel v. Fortner Enterprises, supra,* 429 U.S. at 620–21, 97 S.Ct. at 867–68; plaintiff must show that patients are compelled to purchase the hospital's chosen anesthesia service in return for the use of the hospital's operating room and analagous services. In

2. The agreement between the defendants constitutes an illegal price fixing agreement.

■ Plaintiff contends that section 3(c) of the agreement, which provides that "[f]ees charged by the parties of the second and third parts shall be no greater than those charged by other anesthesiologists for similar work situations in Upstate New York,"[16] establishes unlawful maximum price fixing between defendants. Although this Court does not quarrel with plaintiff's assertion that maximum—as well as minimum—price fixing is a per se evil proscribed by the Sherman Act, *see Albrecht v. Herald Co.,* 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968),[17] it is not clear that the hospital did not stand in the position of a buyer of anesthesia services, and, as such, had a right to set the fees at which it would then distribute those services. *See Group Life & Health Ins. Co. v. Royal Drug Co.,* 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979). Moreover, the *sine qua non* of this, and plaintiff's other theories, that there exists an exclusive contract, has yet to be proven.

■ Instead, this Court believes that, with one exception,[18] this matter should be properly treated, once the exclusivity of the contract has been demonstrated, as one involving a vertical combination. *See Broadcast Music, Inc. v. Columbia Broadcasting Systems, Inc.,* 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979). Such a vertical combination should be analyzed under the rule of reason. *Tampa Electric Co. v. Nashville Coat Co.,* 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961); *Twin City Sportservice, Inc. v. Charles O. Finley & Co.,* 676 F.2d 1291 (9th Cir.1982). As the name suggests, the rule of reason requires the trier of fact to decide whether under all of the circumstances of the case, the restrictive

---

other words, there must be evidence proffered that patients requested Dr. Konik, or other anesthesiologists, and were refused. There must have existed, then, competition between anesthesiologists insofar as patients are concerned. *See United States v. American Society of Anesthesiologists, Inc.,* 473 F.Supp. 147, 160 (S.D.N.Y.1979). If this cannot be shown, the factor of impermissible coercion is missing from the tying arrangement equation and, consequently, plaintiff cannot prevail on this theory. A demonstrated exclusive contract would then be lawful.

Finally, there are two additional problems here. First, it is conceded that if defendant hospital affords proof of a legitimate articulated medical reason for the existence of the tying arrangement, and further demonstrates that there does not exist a less restrictive way to accomplish the end which justifies that medical reason, defendant hospital will be insulated from liability. *See Carpa, Inc. v. Ward Foods, Inc.,* 536 F.2d 39 (5th Cir.1976); *Smith v. Northern Michigan Hospitals, Inc.,* 518 F.Supp. 644 (W.D.Mich.1981). Here, defendant alleges that the tying arrangement provides for continuous coverage and medical competency. However, at least for purposes of this motion, these contentions appear to be refuted by Dr. Konik's assertion that all staff physicians must guarantee medical competency and needed round-the-clock services. (Konik Affidavit, Exs. 13, 14, 15, 16 and 46).

Second, this Court agrees with defendants that under the tying arrangement theory of liability, only the hospital may be liable. This is so since the AAP lacks sufficient market power in the tying product to have anticompetitive effects on the market, *see, e.g., Times Picayune Publishing Co. v. United States,* 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953); *IBM Corp. v. United States, supra,* and plaintiff has not pleaded a conspiracy to engage in a tying agreement between the hospital and the group. (Complaint, ¶ 42).

**16.** *See* Appendix A, *infra.*

**17.** "Maximum and minimum price fixing may have different consequences in many situations. But schemes to fix maximum prices, by substituting the perhaps erroneous judgment of a seller for the forces of the competitive market, may severely intrude upon the ability of buyers to compete and survive in that market." *Albrecht v. Herald Co., supra,* 390 U.S. at 152, 88 S.Ct. at 873.

**18.** However, plaintiff may prevail on a per se price fixing theory here if it can be shown that the agreement or combination was "formed for the *purpose* and with the *effect* of raising, depressing, fixing, pegging or stabilizing the price of a commodity (here anesthesiology services) in interstate or foreign commerce . . . ." (emphasis added) *Arizona v. Maricopa County Medical Society, supra,* —— U.S. at ——, 102 S.Ct. at 2474, 73 L.Ed.2d at 60 (quoting *Kiefer-Stewart Co. v. Segram & Sons,* 340 U.S. 211, 213, 71 S.Ct. 259, 260, 95 L.Ed. 219 (1951)). This is a question of fact that remains to be proved, if possible, at trial.

practice imposes an unreasonable restraint on competition. *Arizona v. Maricopa County Medical Society, supra; Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). "The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition." *National Society of Professional Engineers v. United States, supra,* 435 U.S. at 691, 98 S.Ct. at 1365 (quoting *Board of Trade v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918)).

▮▮▮▮ Here, in the context of a demonstrated exclusive dealing arrangement, the plaintiff may prevail only upon a showing that the agreement results in a substantial foreclosure of competition in an area of competition, that is, in a relevant market. *Tampa Electric Co. v. Nashville Coal Co., supra,* 365 U.S. at 327–28, 81 S.Ct. at 627–28. Since these factors have not been amply demonstrated, summary judgment should be denied on the vertical combination contention. *See Oreck Corp. v. Whirlpool Corp.,* 579 F.2d 126 (2d Cir.1978).

3. The fee schedule set by the members of AAP constitutes an illegal price-fixing arrangement.

In *Arizona v. Maricopa County Medical Society, supra,* the Supreme Court held that a horizontal arrangement between physicians to establish the maximum fees they could claim in full payment for health services provided to policy holders of specified plans was a per se violation of the Sherman Act. In *Maricopa County,* seventy percent of the physicians in that county formed two non-profit foundations for the purpose of promoting fee-for-service medicine and to provide an alternative form of health insurance coverage. The physicians agreed to accept the fees set by the foundations as full payment for services provided patients insured under the foundations' plan. The foundations used relative values and conversion factors in compiling their fee schedule.[19]

In concluding that this scheme was a per se violation, the Court stated:

> In this case the rule is violated by a price restraint that tends to provide the same economic rewards to all practitioners regardless of their skill, their experience, their training, or their willingness to employ innovative and difficult procedures in individual cases. Such a restraint also may discourage entry into the market and may deter experimentation and new developments by individual entrepreneurs. It may be a masquerade for an agreement to fix uniform prices, or it may in the future take on that character.

—— U.S. at ——, 102 S.Ct. at 2475, 73 L.Ed.2d at 61.

Here, plaintiff argues that defendant AAP has set a fee schedule similar to that of the foundations in the *Maricopa County* case, and, therefore, since there is no price competition among the individual members of the professional corporation, the fee schedule adopted by AAP constitutes an illegal price fixing arrangement, a per se violation of the Sherman Act.[20] Plaintiff,

---

**19.** Thus, for example, the conversion factors for "medicine" and "laboratory" were $8.00 and $5.50, respectively, in 1972, and $10.00 and $6.50 in 1974. The relative value schedule provides a numerical weight for each different medical service—thus, an office consultation has a lesser value than a home visit. The relative value was multiplied by the conversion factor to determine the maximum fee. The fee schedule has been revised periodically. The foundation board of trustees would solicit advice from various medical societies about the need for change in either relative values or conversion factors in their respective specialties. The board would then formulate the new fee schedule and submit it to the vote of the entire membership.
*Arizona v. Maricopa County Medical Society, supra,* —— U.S. at ——, 102 S.Ct. at 2471, 73 L.Ed.2d at 56.

**20.** Plaintiff alleges that AAP:
establishes its price based upon units. Two (2) distinct units are used, the first set is based upon the complexity of the procedure used; these units are established by the American Society of Anesthesiologists. The second set is based upon time: 15 minutes equals one unit. The classes of units are added together then multiplied by a dollar value to determine the fee charged. The dol-

however, misses the point of the *Maricopa County* holding, which deals exclusively with a horizontal price fixing arrangement between hundreds of competing physicians. Here in contrast, we are dealing, concededly, with a professional corporation, a situation which is expressly exempted from the *Maricopa County* holding:

> The foundations are not analogous to partnerships or other joint arrangements in which persons who would otherwise be competitors pool their capital and share the risks of loss as well as the opportunities for profit. In such joint ventures, the partnership is regarded as a single firm competing with other sellers in the market. The agreement under attack is an agreement among hundreds of competing doctors concerning the price at which each will offer his own services to a substantial number of consumers. It is true that some are surgeons, some anesthesiologists, and some psychiatrists, but the doctors do not sell a package of three kinds of services. If a clinic offered complete medical coverage for a flat fee, the cooperating doctors would have the type of partnership arrangement in which a price fixing agreement among the doctors would be perfectly proper. But the fee agreements disclosed by the record in this case are among independent competing entrepreneurs. They fit squarely into the horizontal price fixing mold.

—— U.S. at ——, 102 S.Ct. at 2479, 2480. 73 L.Ed.2d at 66, 67.

 Since the situation at bar involves a small professional corporation, the

functional equivalent of a partnership arrangement for antitrust purposes, plaintiff's motion for summary judgment is denied on this price fixing contention and, conversely, granted in favor of the defendants as a matter of law.

4. Denying plaintiff access to the hospital facilities because of her refusal to partake in an allegedly illegal and exclusive price fixing agreement constitutes an illegal boycott.

Plaintiff argues that defendants, by refusing Dr. Konik access to the hospital facilities due to her refusal to join an allegedly illegal and exclusive price fixing agreement, are per se liable under an illegal boycott theory. It must be noted that cases applying per se illegality to collective refusals to deal fall into three categories.

The first group, exemplified by *Eastern States Retail Lumber Dealers Assoc. v. United States*, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490 (1914), have involved horizontal combinations among traders at one level of distribution, whose purpose was to exclude direct competitors from the market. *See also Silver v. New York Stock Exchange*, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963); *Press v. United States*, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945). *Klor's, Inc. v. Broadway-Hale Stores, supra,* illustrates a second category of group boycott cases, involving vertical combinations among traders at different marketing levels, designed to exclude from the market direct competitors of some members of the combination.[21] *See also Radiant Burners,*

---

lar value is set by the P.C. [AAP]. This value has periodically been raised. No member of the P.C. has charged anything but the fees set by this arrangement. Any price modification is subject to unanimous agreement of all members of the P.C., at a board meeting. The P.C. also sets a flat fee for O.B. services provided. Again, no member of the P.C. has charged less then [sic] the fee established.

In addition to the doctors at the P.C. following this fee schedule the *nurse anesthestists* [sic] employed at the P.C. employ the same schedule. There is no differential in the dollar value assigned to units associated with a doctor at the P.C. than those associated with a nurse anesthestists [sic]. The fees

charged by each are identical. In addition, there is no competition with the P.C. for the provision of anesthesia services at the defendant, medical center.

(Memorandum of Law, p. 18).

21. In *Klor's* a large appliance dealer, Broadway-Hale, used its purchasing power to induce defendants manufacturers and wholesalers to sell only at discriminatory prices to plaintiff, a competing appliance dealer. Since the effect of the agreement was to drive Klor's out of competition with Broadway-Hale, the Court found the tripartite agreement illegal per se, notwithstanding the fact that the manufacturers and wholesalers, not in competition with Klor's, probably had no anti-competitive motive.

*Inc. v. People's Gas Light & Coke Co.,* 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961). The third group of cases, unlike the first two categories, has concerned combinations designed to influence coercively the trade practices of boycott victims rather than to eliminate them as competitors. The leading case in this group is *Fashion Originators Guild of America v. Federal Trade Comm'n,* 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941), in which a group of designers refused to sell their "creations" to retailers who purchased and sold copies of the original designs. In holding this refusal to deal illegal per se, the Court stated that even though the object of the boycott was to prevent the retailers from dealing with manufacturers of the copies and thereby eliminate "style piracy," the coercion practiced indirectly on a rival method of competition precluded application of the rule of reason.[22]

▮▮▮▮ In all of these cases, the cornerstone of per se illegality has been the *purpose* and *effect* of the questioned arrangement:

> where exclusionary or coercive conduct has been present, the arrangements have been viewed as 'naked restraints of trade', and have fallen victim to the *per se* rule. On the other hand, where these elements have been missing, the *per se*

rule has not been applied to collective refusals to deal.

*E.A. McQuade Tours, Inc. v. Consolidated Air Tour Manual Committee,* 467 F.2d 178, 187 (5th Cir.1972). Therefore, the resort to the per se rule is justified only when there exists the presence of exclusionary or coercive conduct which, when present, warrants the view that the arrangement is a "naked restraint of trade." Absent these factors, the rule of reason must be followed in determining the legality of the agreement. *See Oreck Corp. v. Whirlpool Corp., supra.*[23]

▮▮▮▮ Plaintiff claims here to fall under both the second and third type of per se group boycott. Specifically, plaintiff alleges that the purpose of the "exclusive" agreement between defendants was to either "drive her out of business" or to coerce her into entering or ratifying an illegal price fixing agreement. (Konik Affidavit, *supra*). It is clear, then, that if proof of these allegations exists, defendants will be liable under the per se group boycott analysis. However, it is equally clear to this Court that plaintiff's summary judgment motion on the above contentions is premature. There exists numerous factual issues remaining to be resolved in the group boycott claim.

5. Defendants have violated the essential facilities doctrine by denying plaintiff access to the hospital facilities.

---

**22.** *See also Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc.,* 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951) (liquor manufacturers' collective refusal to sell to price-cutting wholesalers).

**23.** Defendants cite *Oreck Corp. v. Whirlpool Corp., supra,* for justification that plaintiff's group boycott theory should be analyzed solely under the rule of reason standard since only a "vertical" restraint exists here. However, it is clear that defendants have misread *Oreck.*

*Oreck* involved a case where a dealer's [Oreck Corporation] exclusive distributorship was cancelled by a manufacturer [Whirlpool]. The Second Circuit in *Oreck* distinguished the Supreme Court's holding in *Klor's Inc. v. Broadway-Hale Stores, Inc., supra,* in . that *Klor's* specifically exempted from per se liability a situation where a manufacturer and its dealer agreed to an exclusive distributorship. *Klor's Inc. v. Broadway-Hale Stores, Inc., supra,* 359 U.S. at 212, 79 S.Ct. at 709. Thus, "[t]he present case, involving as it does an

alleged agreement between a single manufacturer and a single dealer, is in essence, an exclusive distributorship controversy [and subject to rule of reason analysis], and the 'group boycott' doctrine is, therefore, not applicable." *Oreck Corp. v. Whirlpool Corp., supra,* 579 F.2d at 131.

However, *Oreck* does not, as defendants contend, hold that all "vertical" restraint cases must be analyzed under the rule of reason standard. Such a view would nullify the *Klor's* and *Fashion Originators Guild of America, supra,* holdings. Indeed, plaintiff's argument here is predicated, it seems, not on the cancellation of *her* agreement with the hospital (a theory that would place plaintiff under the *Oreck* case), but on a situation where it is alleged the defendants combined to exclude her from a market or to coerce her into ratifying the hospital-AAP "exclusive" contract (allegations that fall under *Klor's* and *Fashion Originators Guild*).

The plaintiff has advanced the theory that the defendants have violated the essential facility doctrine. This doctrine, recently defined by the Court of Appeals for the District of Columbia, establishes the rule that "where facilities cannot be practically duplicated by would-be competitors, those in possession of them must allow them to be shared on fair terms. It is illegal restraint of trade to foreclose the scarce facility." *Hecht v. Pro-Football, Inc.,* 570 F.2d 982, 992 (D.C.Cir.1977) (quoting A.D. Neale, *The Antitrust Laws of the United States,* 67 (2d ed., 1970)).[24]

■ The essential facility doctrine, also called the "bottleneck principle," derives from the Supreme Court's 1912 decision in *United States v. Terminal R.R. Ass'n,* 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810 (1912), and more recently was reaffirmed in *Otter Tail Power Co. v. United States,* 410 U.S. 366, 377–78, 93 S.Ct. 1022, 1029–30, 35 L.Ed.2d 359 (1973). To be "essential," a facility need not be indispensable; it is sufficient if duplication of the facility would be economically unfeasible and if denial of its use inflicts a severe handicap on potential market entrants. *See, e.g., Helix Milling Co. v. Terminal Flour Mills Co.,* 523 F.2d 1317, 1320 (9th Cir.1975), *cert. denied,* 423 U.S. 1053, 96 S.Ct. 782, 46 L.Ed.2d 642 (1976). However, the *Hecht* court warned, "this principle must be carefully delimited: the antitrust laws do not require that an essential facility be shared if such sharing would be impractical or would inhibit the defendant's ability to serve its customers adequately." 570 F.2d at 992–93.

■ Plaintiff claims that defendant hospital is an essential facility, since the hospital is the only major medical facility in the tri-county Plattsburgh area,[25] since it is operating continuously and providing major anesthesia services, since it is the area's only referral hospital and teaching institution, and since its reputation and the expertise of its staff are unequaled in the tri-county area. (Konik Affidavit). However, it is not clear, at this point, even assuming, *arguendo,* that defendant hospital is an "essential facility,"[26] that plaintiff has been unfairly denied use of the hospital facilities.[27] Indeed, it has not even been established that the contract between the defendants is an exclusive dealing agreement or that Dr. Konik was justified in not partaking in that agreement. Summary judgment on this issue also must be denied.

## DEFENDANTS' FURTHER SUMMARY JUDGMENT CONTENTIONS

■ Besides defendants' jurisdictional argument and their contention that there exist no facts which can support the presence of an exclusive dealing contract, illegal tying arrangement, group boycott and exclusive facility, all of which this Court believes are questions left to be resolved by the trier of facts, defendant hospital contends that its actions are exempt from Sherman Act liability under the *Colgate* doctrine. Under the doctrine, enunciated in

24. In *Hecht,* plaintiff attempted to acquire a professional football franchise in Washington, D.C., from the American Football League. To acquire a franchise, the plaintiff had to secure a stadium for the team. The only facility available was RFK Stadium. RFK Stadium was the home of the National Football League, Washington Redskins. The Redskins held a long-term lease at RFK Stadium. This lease contained a restrictive covenant which provided that no other football team could rent RFK Stadium during the lease term. The owners of RFK Stadium had tentatively arranged a lease with the plaintiffs for the use of RFK Stadium. However, the deal failed when the Redskins refused to waive their restrictive covenant. The Court in *Hecht* stated that although, "a restrictive covenant did not violate Section 1 of the Sherman Act unless it is an unreasonable restraint of trade; when the restrictive covenant covers an essential facility, however, all possible competition is by definition excluded and the restraint is thus unreasonable per se." *Hecht v. Pro-Football, Inc., supra,* 570 F.2d at 993 n. 45.

25. Clinton, Essex and Franklin Counties.

26. Defendants contend that there exist many hospitals in the tri-county area that duplicate defendant hospital's services.

27. Defendant hospital, moreover, may demonstrate that an exclusive agreement may serve to improve the delivery of anesthesiology services and, thus, be justified under *Hecht.*

*United States v. Colgate & Co.,* 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919), unilateral policy decisions, motivated by "market strategy" or "business necessity," which impose a reasonable vertical restraint, cannot give rise to antitrust liability.[28] *See also Michelman v. Clark-Schwebel Fiber Glass Corp.,* 534 F.2d 1036, 1042 (2d Cir.1976), *cert. denied,* 429 U.S. 885, 97 S.Ct. 236, 50 L.Ed.2d 166 (1976); *Modern Home Inst. Inc. v. Hartford Acc. & Indemnity Co.,* 513 F.2d 102, 108–09 (2d Cir.1975).

■ Here, it is argued that the hospital is acting in a reasonable manner by requiring an agreement to provide regularity in the delivery of anesthesiology services. However, it is not apparent that the agreement is necessary to provide such services. (Konik Affidavit, ¶ 33). Moreover, since plaintiff's group boycott theory remains to be established at trial, it would be inappropriate to grant summary judgment on behalf of defendant hospital under the *Colgate* doctrine.[29]

Finally, defendants assert that the agreement between the parties cannot possibly be exclusive since Dr. Konik has been asked many times to become a signatory of the agreement. Therefore, the argument goes, since plaintiff's Section 1 claims are all predicated on the existence of an exclusive agreement, the non-existence of exclusivity warrants summary judgment.

■ While this Court agrees with defendants that plaintiff's Section 1 claims are predicated upon the existence of an exclusive agreement, the very fact that plaintiff refused to join in the agreement does not necessitate an award of summary judgment. This is true for two reasons. First, defendants' offer to join plaintiff to the agreement is only *some* evidence of non-exclusivity. Plaintiff may still demonstrate that, as to others, this agreement remains closed and that an exclusive dealing contract exists. Second, plaintiff alleges that the contract itself is unlawful. To force plaintiff to agree to, and abide by, the allegedly unlawful contract in order to be able to attack that agreement under the Sherman Act would present Dr. Konik with the ironic situation of litigating the lack of competition while being a party to the restraint of trade, a position that this Court finds untenable.

## IV

In conclusion, since there are a number of material facts remaining to be resolved, plaintiff's motion for partial summary judgment is denied. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Defendants' motion for summary judgment is granted to the extent that plaintiff's horizontal price-fixing claim is dismissed in accordance with the above, and denied in all other respects.

This Memorandum-Decision and Order is intended to support and modify the Order signed on February 1, 1983 denying summary judgment in this action.

It is so Ordered.

## APPENDIX A

### MEMORANDUM OF UNDERSTANDING

Memorandum of Understanding made this 31st day of August, 1978, by and between CHAMPLAIN VALLEY–PHYSICIANS HOSPITAL MEDICAL CENTER, a membership corporation with an office and

---

**28.** In *United States v. Colgate, supra,* the Court held that a seller has complete freedom to select his own customers absent an attempt to enforce retail price maintenance.

**29.** As the Court in *Cernuto, Inc. v. United Cabinet Corporation,* 595 F.2d 164, 168, (3rd Cir. 1979), stated:

[w]hen a manufacturer acts on its own, in pursuing its own market strategy, it is seeking to compete with other manufacturers by imposing what may be defended as reasonable vertical restraint... However, if the action of a manufacturer or other supplier is taken at the direction of its customer, the restraint becomes primarily horizontal in nature in that one customer is seeking to suppress its competition by utilizing the power of a common supplier. Therefore, although the termination in such a situation is, itself, a vertical restraint, the desired impact is horizontal and on the dealer, not the manufacturer level.

place of business in the City of Plattsburgh, County of Clinton and State of New York, party of the first part; ANESTHESIA AS-SOCIATES OF PLATTSBURGH, P.C., a professional corporation having its principal place of business at 265–A Cornelia Street, Plattsburgh, New York, party of the second part; and LOUISE S. KONIK, M.D., of 29 Grace Avenue, Plattsburgh, New York, party of the third part, in manner following:

## WITNESSETH:

WHEREAS, party of the first part must provide community anesthesiology services sufficient in quantity and quality to meet the ongoing surgical and obstetrical demand of its patients and wishes to assure the proper and timely availability of such service; and

WHEREAS, parties of the second and third parts have heretofore *demonstrated their ability to provide high quality anesthesiology services* to party of the first part and are well qualified to continue to do so by reason of their familiarity with the community and its people and with the facilities, medical staff, employees, practices, procedures, rules and regulations of party of the first part; and

WHEREAS, parties of the second and third parts are willing to assume the responsibility of providing the community anesthesiology service required at whatever level is required.

NOW, THEREFORE, considering the need to provide for the *continuing welfare of the Medical Center,* it is understood that party of the first part *will afford to parties* of the second and third parts the facilities for providing anesthesiology services as long as the understandings included herein are complied with, and parties of the second and third parts will and do themselves, or in conjunction with any others hereafter admitted to the Medical Staff of party of the first part, undertake to provide the required services in the following manner and under the following terms and conditions which *shall be reviewed every six months by the parties hereunto.*

## 1. DEFINITION OF SERVICE REQUIRED:

The service of a qualified anesthesiologist or duly certified nurse anesthetist available at all times and, when needed as determined by a designee of party of the first part, present in surgical or delivery rooms either personally administering or supervising the delivery of anesthesia. When nurse anesthetists are utilized, they must be supervised by an anesthesiologist in a manner consistent with the New York State Health Code and all other applicable rules and regulations.

## 2. AMOUNT OF SERVICE REQUIRED:

(a) Sufficient anesthesiology services as defined above to complete in an efficient and timely manner all of the routine surgical cases scheduled on a daily basis by the hospital operating room supervisor.

(b) Sufficient anesthesiology services as defined above to provide 24-hour-a-day, 365-days-a-year emergency coverage as required. Such emergency coverage shall be available within fifteen minutes to the operating room.

(c) Sufficient anesthesiology services as defined above to provide 24-hour-a-day, 365-days-a-year services to the Obstetrical Department. Such anesthesiology services shall be available within fifteen minutes to the operating room or to the delivery suite.

## 3. TERMS AND CONDITIONS:

(a) The Chief of the Anesthesiology Service *will* make all work and room assignments for all anesthesiologists in a fair and equitable manner and a manner consistent with meeting all of the service requirements of the hospital.

(b) Patient or physician requests for a specific anesthetist or anesthesiologist will be acknowledged and granted where such requests do not duly disrupt the routine operation of the surgical department or obstetrical department or of the hospital, or in any other way infringe upon the rights of other patients for prompt, safe and effi-

cient service. In the event of a dispute not resolved by the Chief of Anesthesiology Services, the Chief of the Medical Staff will make final decisions with respect to patient requests and anesthesiologist room assignments.

(c) Fees charged by the parties of the second and third parts shall be no greater than those charged by other anesthesiologists for similar work situations in Upstate New York.

(d) No more than ten (10) vacation days will be taken by any anesthesiologist during June, July and August without written agreement between the parties and rotating call schedules shall be established by the Chief of Anesthesiology Service for holidays including Christmas, Easter, Fourth of July and Labor Day unless the parties otherwise agree. In the event of the temporary inability of any anesthesiologist to perform his or her duties pursuant to this Understanding by reason of sickness or accident, each of the parties of the second part and third part agrees to continue to provide full coverage to the Medical Center during such period of inability.

4. Nothing in this understanding shall be construed as imposing or creating an employer-employee relationship between the parties, parties of the second and third parts to be independent *contractors* billing on a fee-for-service basis and each handling its own billing and accounting.

5. Parties of the second and third parts agree to work in accordance with the terms of this Understanding subject to the rules and regulations of the Board of Directors of the Medical Center; the rules and regulations and by-laws of the Medical Center's Medical Staff; appropriate New York State Department of Health codes and regulations; and the requirements of the Joint Commission for Hospital Accreditation.

6. In the event of any dispute between the parties relative to the method of carrying out the terms of this Understanding not resolved as hereinabove set forth, the matter shall be referred to the Executive Committee of the Board of Directors whose decision shall be promptly rendered and shall be final and binding upon all parties.

IN WITNESS WHEREOF, the parties have set their hands and seals the day and date first above written.

CHAMPLAIN VALLEY–PHYSICIANS
HOSPITAL MEDICAL CENTER
By: /s/ David Hannan
President
ANESTHESIA ASSOCIATES OF PLATTSBURGH, P.C.
By: /s/ John Menustik
President

LOUISE S. KONIK, M.D.

ON MOTION FOR DIRECTED VERDICT

Before this Court are the parties' cross motions for a directed verdict at the close of all the evidence. Also before the Court is the defendants' motion for directed verdict made at the close of plaintiff's evidence.

These motions are made pursuant to the provisions of Rule 50(a) of the Federal Rules of Civil Procedure.

Plaintiff has remaining four theories predicated on Section 1 of the Sherman Act and three remaining theories based on Section 2 of that Act. I will first address the Section 1 theories.

As I stated in my February 28, 1973 summary judgment opinion, the genesis, the starting point, of all of plaintiff's antitrust claims is the existence of an exclusive contract. Here, the overwhelming evidence demonstrates that the contract was non-exclusive. The tortured history of contractual negotiations between the hospital, the AAP, and Dr. Konik shows that, although the proposed contractual arrangements prior to Dr. Konik's departure from the AAP may have provided for an exclusive dealings contract, and indeed for a written fee schedule, these terms were deleted from the final August 31, 1978 agreement. That agreement is now in effect and contemplates that other anesthesiologists not now members of the AAP may in the future be admitted to

the medical staff and provide anesthesiology services at the hospital. Therefore, it is contemplated that there be competition among anesthesiologists. Further evidence of non-exclusivity is found in testimony indicating that Dr. Konik had the option of re-joining the AAP as an active participant or providing services to the hospital on an independent basis, subject to the terms of the proposed agreement between herself, the AAP and the hospital. Other evidence of non-exclusivity includes the deposition testimony of Dr. Pang, who, after being denied membership in the AAP, was nonetheless offered the privilege of providing anesthesiology services on an independent basis.

The only cogent evidence that plaintiff presents concerning the exclusivity issue is the ambivalent testimony of Dr. Modak. Although Dr. Modak testified that Dr. Bayoumy, chief of anesthesiology and a member of the AAP, told him that membership in the AAP was a prerequisite to the provision of anesthesiology services at defendant hospital, Dr. Modak also testified that he was instructed by Dr. Moynihan, the hospital's chief of staff, that Dr. Modak could, in fact, practice at the hospital without joining the AAP and should file an application for staff privileges. That application was submitted but later withdrawn.

■ Moreover, the evidence of minutes of the AAP's internal proceedings which plaintiff relies on to demonstrate the exclusivity of the contract merely shows that the AAP wished to enter into some form of accommodation with Dr. Konik. It by no means demonstrates that the agreement presently in effect is an exclusive dealings arrangement nor does it indicate some form of conspiracy to exclude plaintiff from the practice of medicine. In short, then, the overwhelming evidence presented to this Court is that there exists no exclusive arrangement in fact among the defendants.

■ I want to make several related points. Plaintiff feels that the very existence of a contract between the hospital and the AAP constitutes an illegal arrangement. This belief apparently is based on the fact that the purpose of that contract is redundant of the purposes achieved by the by-laws of the hospital and the rules and regulations of the anesthesiology department providing for 24-hour continuous and quality-controlled anesthesia service. Plaintiff misses the point. The hospital has the right to contract with any party it chooses in order to provide services. See *U.S. v. Colgate and Co.,* 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919).

■ Here plaintiff must demonstrate that the contract is unlawful or that the purpose of the contract, besides being superfluous, is unlawful. This was not done. The existence of the contract by itself proves nothing.

■ Regardless of whether exclusivity has been demonstrated, plaintiff, I believe, has failed to show several other elements in support of her remaining Section 1 claims. With respect to plaintiff's vertical price fixing claim, there is no evidence on record that defendant hospital and AAP conspired to, or, in fact, fixed prices. Although Section 3(c) of the 1978 agreement provides that,

"Fees charged by the parties of the second and third parts shall be no greater than those charged by other anesthesiologists for similar work situations in Upstate New York",

this Court finds that the quoted language by itself is not evidence of price fixing. Accordingly, any finding that defendants have combined to fix prices would be speculation at best. Therefore, plaintiff has proffered not a scintilla of evidence in support of her vertical price fixing theory.

As to any rule of reason argument, the only anti-competitive effects that plaintiff has alleged is the exclusion of Dr. Konik from the hospital's facilities. However, as indicated earlier, plaintiff has failed to demonstrate the exclusivity of the contract at issue. Therefore, there is absolutely no showing of anti-competitive effects from the arrangements between the hospital and the AAP. Accordingly, plaintiff's rule of reason arguments must fail as well.

724

As to the group boycott argument, there is no evidence before me to support this theory. First, there is no evidence that the contract is exclusive and therefore prohibits plaintiff from competing with the AAP. Second, there is a total failure of evidence indicating a conspiracy or combination to boycott plaintiff or to preclude her from the practice of medicine. In fact, the evidence is all to the contrary. Defendants, it appears, made substantial efforts to accommodate Dr. Konik in the proposed arrangements. Additionally, as to the essential facility doctrine, assuming that defendant hospital is such a facility, plaintiff has nonetheless failed to demonstrate any severe economic handicap resulting from her alleged exclusion. In fact, there is testimony indicating that plaintiff has worked, and can continue to work, in other facilities.

Finally, I want to emphasize again that underlying each of plaintiff's Section 1 claims is the alleged exclusivity of the contract at issue. Having failed to adduce evidence of this exclusivity, each of plaintiff's Section 1 claims must fail.

Moreover, for the same reason, plaintiff's Section 2 claims must also fail, since it has not been shown that defendants eliminated significant competition or attempted or conspired to eliminate competition.

The test for a directed verdict in this circuit is as follows, and I quote from *Epoch Producing Corporation v. Killiam Shows, Inc.*, 522 F.2d 737, 742–43 (2d Cir.1975), cert. denied, 424 U.S. 955, 96 S.Ct. 1429, 47 L.Ed.2d 360.

"If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury."

Applying that test to the motions made at the conclusion of the evidence in this case, it is clear that there was a failure of proof on all the plaintiff's claims.

The Court's rulings are as follows:

Number 1, the motion by defendants for directed verdict at the close of plaintiff's evidence is denied.

Number 2, the motion by plaintiff for a directed verdict at the close of all of the evidence is denied.

Number 3, the motion by defendants for a directed verdict at the close of all of the evidence is granted.

The clerk is directed to enter judgment accordingly.