733 F.2d 1007
 1984-1 Trade Cases 65,962
 Louise KONIK, M.D., Plaintiff-Appellant,
v.
CHAMPLAIN VALLEY PHYSICIANS HOSPITAL MEDICAL CENTER,
Anesthesia Associates of Plattsburgh, P.C., David T. Hannan,
as President of Champlain Valley Physicians Hospital, and
individually; Michael J. Moynihan, M.D., as Chief of Staff
of Champlain Valley Physicians Hospital Medical Center, and
individually; Salem Bayoumy, M.D. as Chief of the
Department of Anesthesiology, Champlain Valley Physicians
Hospital Medical Center, and individually; and John
Menustik, M.D., as President, Anesthesia Associates of
Plattsburgh, P.C., and individually, Defendants-Appellees.
 No. 65, Docket 83-7191.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 1, 1983.
Decided April 25, 1984.
 
 Michael L. Costello, Albany, N.Y. (David A. Ruffo, Tobin & Dempf, Albany, N.Y., on brief), for plaintiff-appellant.
 Fitzpatrick, Bennett, Trombley, Lennon & Owens, P.C., Plattsburgh, N.Y., for defendants-appellees Champlain Valley Physicians Hosp. Medical Cent., David T. Hannan, Michael J. Moynihan and Salem Bayoumy.
 Susanna L. Fisch, Albany, N.Y. (James S. Carter, Carter, Conboy, Bardwell, Case & Blackmore, Albany, N.Y., on brief), for defendants-appellees John Menustik and Anesthesia Associates of Plattsburgh, P.C.
 Squire, Sanders & Dempsey, Washington, D.C. (Michael Scott, Rickard F. Pfizenmayer, Timothy W. Bergin, Washington, D.C., on brief), for amicus curiae The American Soc. of Anesthesiologists, Inc.
 Before KEARSE, CARDAMONE and WINTER, Circuit Judges.
 KEARSE, Circuit Judge:
 
 
 1
 Plaintiff Louise Konik, M.D., a physician whose speciality is anesthesiology, appeals from a final judgment of the United States District Court for the Northern District of New York, Roger J. Miner, Judge, dismissing her complaint under Secs. 1 and 2 of the Sherman Act, 15 U.S.C. Secs. 1, 2 (1982), and Sec. 4 of the Clayton Act, 15 U.S.C. Sec. 15 (1982), which alleged, inter alia, that defendants Champlain Valley Physicians Hospital Medical Center and certain of its officials (collectively the "Hospital"[1]), and defendants Anesthesia Associates of Plattsburgh, P.C., and its president (collectively "AAP"), had, with respect to the provision of anesthesiology services in the Hospital, engaged in unlawful price-fixing (both vertical and horizontal), group boycott, tying, monopolization, and conspiracy and attempt to monopolize. Prior to trial, in an opinion reported at 561 F.Supp. 700 (N.D.N.Y.1983), the district court granted partial summary judgment in favor of defendants on Konik's claim that AAP and its members had engaged in horizontal price-fixing. On March 2, 1983, following a four-week trial, the district court granted defendants' motion for a directed verdict with respect to Konik's remaining claims. Id. at 722-24. On appeal Konik claims principally that the trial evidence warranted a directed verdict in her favor rather than against her. For the reasons below, we conclude that the court properly dismissed Konik's claims, and we affirm the judgment.I. BACKGROUND
 
 
 2
 The case concerns the rendering of anesthesiology services at the Hospital, which is located in the City of Plattsburgh, Clinton County, New York. Dr. Konik, a licensed anethesiologist, has been a member of the medical staff of the Hospital since 1961. Her professional competence is not disputed. The fundamental facts as they emerged at trial are as follows.
 
 A. Pre-1978 Arrangements
 
 3
 Prior to 1961, the practice of anesthesiology at the Hospital had developed on an ad hoc basis, in cooperation with private surgeons who were members of the medical staff. A surgeon who was to perform an operation would schedule the procedure at the Hospital and engage an anesthesiologist who also had staff privileges at the Hospital. Similarly, emergency services were arranged for by the surgeon or obstetrician responsible for the procedure requiring anesthesia. Patients or their insurers were billed directly by the anesthesiologist on a fee-for-service basis.
 
 
 4
 In the 1960's the methods were changed both for emergency services and for scheduled services. For emergency anesthesia, a new "call schedule routine" required each member of the anesthesiology department, on a rotating basis, to be "on call" for 24 hours, ready to perform services on 15 minutes' notice. In 1968 the method for handling scheduled surgery was changed from individual arrangements between surgeons and anesthesiologists to a "central booking" system. Using the new method, the surgeon scheduling a surgical procedure would notify a clerk at the hospital; if he requested a particular anesthesiologist, the request would be honored if feasible. When the scheduling surgeon did not request a particular anesthesiologist, the assignment would be made by the Chief of the Department of Anesthesiology.
 
 
 5
 In 1971, with the encouragement of the Hospital, the four anesthesiologists then on the staff of the Hospital, including Konik, formed a partnership; in 1973, the partnership was converted into a professional corporation, defendant AAP. Each of the four anesthesiologists associated with AAP was a shareholder and employee of the corporation. In 1977 a fifth anesthesiologist joined AAP; there were five until Konik resigned in 1978.
 
 
 6
 Although there was no formal contract between the Hospital and AAP giving AAP the exclusive right to provide anesthesiology services during this period, in fact all physicians holding anesthesia staff privileges at the Hospital were either shareholders or employees of AAP. Assignments continued to be made as a departmental matter, by the Hospital's Chief of Anesthesiology. AAP both billed its patients and distributed its revenues independently of the Hospital.
 
 B. The 1978 Contract
 
 7
 On May 9, 1978, because of a lack of harmony and cooperation among the shareholder/employees of AAP, Konik notified AAP of her withdrawal from the corporation 90 days thence. She thereafter informed AAP and the Hospital that she intended to continue to provide anesthesiology services at the Hospital. The Hospital administrators, however, notified operating room supervisors that after August 9, 1978, the effective date of Konik's resignation from AAP, Konik would not be permitted to provide such services at the Hospital. Thereafter, the Hospital's August 9 cutoff date was extended to September 1, and Konik continued, independently of AAP, to provide anesthesiology services at the Hospital until September 1, 1978.
 
 
 8
 In the meantime, AAP and the Hospital sought to negotiate with each other and with Konik an agreement covering the provision of anesthesiology services at the Hospital. Eventually, the Hospital and AAP entered an agreement dated August 31, 1978, entitled "Memorandum of Understanding" ("the Contract"), the text of which is set forth in the district court's opinion, 561 F.Supp. at 720-22. As executed, the Contract, which is the focus of Konik's antitrust challenges, provided, in pertinent part, (1) that AAP would provide sufficient anesthesiology services to the Hospital to ensure (a) anesthesiology services on all scheduled matters, (b) emergency coverage in the operating room 24 hours a day, 365 days a year, on 15 minutes' notice, and (c) obstetrical anesthesiology services in the operating room or the delivery suite 24 hours a day, 365 days a year, on 15 minutes' notice; (2) that the fees charged by the anesthesiologists would be no greater than those charged by other anesthesiologists for similar work situations in upstate New York; and (3) that no more than ten vacation days would be taken by any anesthesiologist during June, July, and August without written agreement between the parties. The Contract recognized that AAP was an independent contractor and provided that it would render the required services either itself "or in conjunction with any others [t]hereafter admitted to the Medical Staff of [the Hospital]." The Contract provided that its terms and conditions were to be reviewed by the parties every six months.
 
 
 9
 Konik was invited to become a party to this Contract, which had been drafted as a tripartite agreement among the Hospital, AAP, and Konik. AAP was defined as the "party of the second part"; Konik was defined as the "party of the third part"; and all provisions setting forth the rights, privileges, responsibilities, and undertakings of the anesthesiologists referred, without differentiation, to both the party of the second part and the party of the third part.
 
 
 10
 Konik declined to enter into the Contract. Instead, in a document dated September 29, 1978, she proffered to the Hospital and AAP a version of a contract ("Konik Proposal") that differed from the Contract in several material respects. Although it contained the same provisions for the amount of service to be ensured, and it too imposed the requirement that the fees charged not be higher than those charged by anesthesiologists in similar upstate New York situations, the Konik Proposal (1) provided that the Hospital would not permit any other anesthesiologist, including those thereafter admitted to the Hospital's medical staff, to use the Hospital's facilities without first agreeing to and executing an understanding as reflected in the Konik Proposal; (2) eliminated the provision that the contract "shall" be reviewed every six months and provided instead that it "may" be so reviewed, and further provided that unless all parties agreed in writing to a modification, the contract envisioned by the Konik Proposal would remain in effect; and (3) provided that up to 40 "operating room working days" could be taken off by any anesthesiologist for vacations, holidays, or attendance at professional conferences, seminars, or courses, and that requests for such days off would be honored on a "first request made basis." The Konik Proposal provided that Konik's execution of the agreement was not to be deemed a waiver of any preexisting cause of action she might have against AAP or the Hospital. Konik signed the Konik Proposal and submitted it to AAP and the Hospital, both of which rejected it.
 
 
 11
 After September 1, 1978, the Hospital refused to allow Konik to provide anesthesiology services at the Hospital unless she signed the Contract. She did not sign it, and, although she has retained her senior staff privileges, she has not been allowed to provide anesthesiology services at the Hospital since that date.
 
 C. The Dismissals of Plaintiff's Claims
 
 12
 Dr. Konik commenced the present lawsuit in 1979, seeking inter alia, treble damages under Sec. 4 of the Clayton Act.[2] She contended that the Contract was an exclusive arrangement that violated Sec. 1 of the Sherman Act by (1) having the Hospital boycott her, (2) allowing the members of AAP to fix maximum prices for anesthesiology services in Plattsburgh, (3) vertically fixing the prices to be charged to patients of the Hospital, and (4) allowing the Hospital to tie use of its operating facilities to the purchase of anesthesiology services from AAP. Konik contended also that defendants had monopolized, and attempted and conspired to monopolize, the market for anesthesiology services in Clinton County, in violation of Sec. 2 of the Sherman Act.
 
 
 13
 On February 28, 1983, prior to trial, the district court summarily dismissed the claim that the AAP members had engaged in horizontal price-fixing, ruling that as a professional corporation, AAP was a single seller of services, competing with others in the market. Accordingly, AAP's setting of the fees it would charge did not constitute a horizontal agreement. See Arizona v. Maricopa County Medical Society, 457 U.S. 332, 356-57, 102 S.Ct. 2466, 2479-2480, 73 L.Ed.2d 48 (1982). The court denied defendants' motions to dismiss Konik's other antitrust claims, and those claims went to trial.
 
 
 14
 At the close of the trial evidence, both sides moved for a directed verdict. On March 2, 1983, in an opinion reported at 561 F.Supp. 722-24, the court denied Konik's motion and granted that of the defendants. The court stated that the premise of all of Konik's antitrust claims was that the Contract was an exclusive contract, i.e., that it excluded Konik and others from the practice of anesthesiology at the Hospital. After all the evidence had been presented, the court found it overwhelmingly demonstrated that the Contract was nonexclusive, since the document contemplated that other anesthesiologists might in the future be admitted to the Hospital staff and would provide anesthesiology services there, and since Konik herself had the option of either rejoining AAP or providing services to the Hospital independently subject to the terms of the Contract. The court, quoting Epoch Producing Corp. v. Killiam Shows, Inc., 522 F.2d 737, 742-43 (2d Cir.1975), cert. denied, 424 U.S. 955, 96 S.Ct. 1429, 47 L.Ed.2d 360 (1976), concluded that "reasonable men could not arrive at a contrary verdict." The court found that the nonexclusivity of the Contract defeated Konik's claims of boycott, tie-in, and Sec. 2 violations.
 
 
 15
 The court went on to find that there was no evidence that AAP and the Hospital had conspired to fix prices vertically. The court found that the provision in the Contract that AAP would charge prices no higher than those charged in similar circumstances in other upstate New York communities was not in itself evidence of price-fixing.
 
 
 16
 Judgment was entered dismissing the complaint. Konik appeals from the court's March 2 rulings on the motions for directed verdict.
 
 II. DISCUSSION
 
 17
 We have reviewed the trial record and we agree with the district court that a reasonable jury could not have found that the Contract between the Hospital and AAP was an exclusive dealing arrangement that excluded Konik. The proposition that Konik was excluded by that Contract was the linchpin of most of Konik's claims, and we conclude that the claims of boycott, tying, attempted monopolization, and conspiracy to monopolize were properly dismissed on this basis. As to the remaining claim that the defendants had entered into a vertical price-fixing arrangement,[3] we conclude that although there was evidence as to the existence of such an agreement, no rational jury could find that Konik had been injured by the agreement.
 
 A. The Nature of the Contract
 
 18
 It is well established that in ruling on a motion for a directed verdict, the trial court must determine whether the evidence, viewed in the light most favorable to the nonmoving party, is sufficient to allow a reasonable juror to arrive at a verdict in the latter's favor. Brady v. Southern Railway Co., 320 U.S. 476, 479-80, 64 S.Ct. 232, 234-235, 88 L.Ed. 239 (1943); Armstrong v. Commerce Tankers Corp., 423 F.2d 957, 959 (2d Cir.), cert. denied, 400 U.S. 833, 91 S.Ct. 67, 27 L.Ed.2d 65 (1970). In making this determination, all reasonable inferences must be drawn in favor of the nonmoving party, and all questions of credibility must likewise be decided in his favor. See, e.g., O'Connor v. Pennsylvania Railroad Co., 308 F.2d 911, 914 (2d Cir.1962); 9 C. Wright & A. Miller, Federal Practice and Procedure Secs. 2524-2528 (1971). If, within this framework, the court concludes that the jury could not rationally find in favor of the nonmoving party, it may properly grant the motion for a directed verdict.[4]
 
 
 19
 Our function as a reviewing court is similar. When the district court has granted a directed verdict, we too must view the evidence in the light most favorable to the nonmoving party, resolving all issues of credibility and drawing all reasonable inferences in his favor. See Schwimmer v. Sony Corp., 677 F.2d 946, 951-52 (2d Cir.1981), cert. denied, 459 U.S. 1007, 103 S.Ct. 362, 74 L.Ed.2d 398 (1982). Our review of the record in the present case convinces us that, even after drawing all permissible inferences and resolving any issue of credibility in Dr. Konik's favor, there was insufficient evidence from which the jury could rationally find that the defendants excluded or attempted to exclude Konik from the practice of anesthesiology at the Hospital.
 
 
 20
 It is clear that the terms of the Contract challenged by Konik did not exclude her. As set forth above, after Konik withdrew from AAP, the Contract was proposed as a three-way arrangement among the Hospital, AAP, and Konik, permitting Konik to practice independently of AAP. Konik was invited to become a party to the Contract on terms that in no way discriminated against her.[5] Defined as the "party of the third part," Konik was joined in lock-step with AAP, subject to precisely the same responsibilities and given precisely the same benefits as the anesthesiologists who were members of AAP. The Contract was the culmination of many weeks of negotiations directed toward accommodation of Konik's desire to practice anesthesiology at the Hospital without being a member of AAP. Had she signed the Contract, she would have been allowed to render anesthesiology services alongside the members of AAP. Plainly the terms of this nondiscriminatory agreement cannot be the basis for a rational conclusion that she was excluded by the defendants.
 
 
 21
 Nor would the evidence support a finding that the terms of the Contract excluded all anesthesiologists other than Konik. The agreement explicitly contemplated that AAP would undertake to provide the required services not only along with Konik as a signatory of the Contract, but also "in conjunction with any others hereafter admitted to the Medical Staff of" the Hospital. Further, the Contract provided that its terms and conditions were to be reviewed by the parties every six months; it gave none of the three proposed signatories any power to perpetuate the arrangement over the objection of any other party. Thus, at the end of any six-month period the Hospital would be entirely free to contract with a provider of services other than AAP.
 
 
 22
 In arguing that the court erred in concluding that the Contract was not an exclusionary device, Konik relies principally on minutes of meetings of the AAP board of directors and on the testimony of two non-AAP anesthesiologists, Dr. Suk-Woon Pang and Dr. Agit Modak. We have reviewed this evidence and for the reasons below conclude that neither it nor the other evidence of record was sufficient to permit a jury to find that the Contract excluded Konik or others.
 
 
 23
 Konik quotes various excerpts of the AAP board minutes and argues that the statements of AAP members there reported reflect their intention to (1) "control and coercively influence her practice" (Konik brief on appeal at 14), (2) exclude other anesthesiologists (id. at 13-14), and (3) avoid litigation (id. at 14). We find no antitrust merit on these contentions. Only the first two merit discussion.
 
 
 24
 It is evident from the record, as Konik suggests by her description of AAP as wishing to "control" her practice, that AAP did not wish to have her practice independently of AAP without her having an obligation to shoulder an aliquot share of the responsibilities. There is nothing anticompetitive, however, in the insistence, by a service group that undertakes to provide not only active service but in addition extensive standby service, on a contract with the purchaser whereby a competitor of the group is not allowed to pick and choose assignments in such a way as to reap the benefit of the group's commitment to extensive coverage without the competitor's having to undertake such obligations. There can be no doubt that the time-off provisions inserted in the Konik Proposal were of importance to Konik and reflected a matter of concern to AAP. Konik testified that over the years vacations had been a subject of disputes at AAP and that she had often complained that she wished to work less. Konik's proposal provided that an anesthesiologist could take off 40 working days, with requests for such time off to be honored on a first-request-received basis. Konik's husband was a surgeon on the staff of the Hospital, and nonemergency surgery was normally scheduled six months in advance. No doubt AAP had visions of Konik's husband's requesting Konik's services as an anesthesiologist, thereby ensuring that she could earn fees at times convenient to her and her family, and that this, together with Konik's expanded provision for time off and her ability to make early requests for such time, would enable Konik to avoid much of the less profitable coverage responsibility undertaken by AAP. Such a possibility is not an inappropriate business concern, and antitrust analysis takes into account that some arrangements may be necessary in order to remedy "market imperfections such as the so-called 'free rider' effect." See Continental T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 55, 97 S.Ct. 2549, 2560, 53 L.Ed.2d 568 (1977).
 
 
 25
 Further, the fact that AAP sought a contract to prevent the rendering of service by another group of anesthesiologists does not mean that the agreement eventually entered into was exclusionary in the antitrust sense. As a practical matter, every contract excludes, at least to some degree, those who are not parties to it. See, e.g., Chicago Board of Trade v. United States, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918) ("Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence.") Indeed, it is the nature of competition that at some point there are winners and losers, and the losers are excluded. Plainly the Hospital is not required to open its operating rooms to any and all anesthesiologists who wish to practice there. As the Supreme Court noted recently in Jefferson Parish Hospital District No. 2 v. Hyde, --- U.S. ----, ----, 104 S.Ct. 1551, 1568, 80 L.Ed.2d 2 (1984) ("Hyde "), a "hospital[ ] [has the] unquestioned right to exercise some control over the identity and number of doctors to whom it accords staff privileges."
 
 
 26
 The question having antitrust significance here is not whether the competition has culminated in a contract that excludes the losers but rather whether the contractual exclusion itself is of such scope that its restraints may be considered unreasonable. If, for example, the agreement granted the provider of the services an interminable exclusive franchise, there could well be antitrust implications. The Contract challenged here, however, did no such thing. In addition to permitting the Hospital to purchase the services of Konik and any others added to its staff, the Contract provided that it was to be reviewed at six-month intervals. Thus, the Hospital was free at the end of six months to enter into a new arrangement either with AAP or with any other anesthesiologist. Indeed, it was the Konik Proposal, not the Contract, that would have perpetuated an arrangement at the behest of AAP or Konik: the Konik Proposal, unlike the Contract, provided that the arrangement could not be terminated or even revised without the consent of all of the parties thereto.
 
 
 27
 We find no greater merit in Konik's reliance on the testimony of Drs. Pang and Modak. In the spring of 1981, Pang was an employee of AAP. He apparently wanted to become a member of the corporation and to practice anesthesiology with it. Under AAP's by-laws, no new member was to be accepted without the unanimous consent of the old members. Pang failed to receive unanimous approval and thus was not allowed to join AAP. This did not end the matter, however. AAP informed Pang that he could practice independently of AAP, and offered to enter, with Pang, a contract similar to the one offered to Konik.[6] Pang declined and went to practice anesthesiology in New Jersey. Far from showing that the defendants excluded Pang from the practice of anesthesiology at the Hospital, Pang's testimony thus showed that they offered him that very opportunity.
 
 
 28
 Modak was an anesthesiologist who applied to the Hospital for admittance to the staff in August 1978. He was advised by the Hospital administrators that his credentials were adequate and that he would be able to practice anesthesiology at the Hospital "as an independent practitioner." (Tr. 1062.) Modak had a conversation with defendant Dr. Salem Bayoumy, Chief of the Hospital's Anesthesiology Department and a member of AAP, in which, according to Modak, Bayoumy told him, inter alia, "You cannot practice independently unless you join the group." (Tr. 1072.) Modak testified that he subsequently was informed by the Hospital that action on his application would be delayed, and that he immediately withdrew his application because he did not want "a hassle" with AAP. (Tr. 1056.) Regardless of Modak's mental processes, however, if his testimony as to what he was told were believed, it could not allow a jury to find that the defendants excluded him from the practice of anesthesiology at the Hospital. The Hospital administrators--who controlled access to the operating suites--told him he could practice anesthesiology independently; and to the extent that Bayoumy's statement that Modak could not practice independently unless he joined the group had any meaning, it could only have meant that AAP would offer to allow Modak to enter into an agreement like the Contract with AAP: otherwise the concepts of practicing independently and joining the group are mutually exclusive.
 
 
 29
 In sum, we see no basis in the record from which a rational jury could have concluded that either Konik or other anesthesiologists were excluded from the practice of anesthesiology by means of the Contract between the Hospital and AAP.
 
 
 30
 Finally, Konik argues, in effect, that she was constructively excluded by means of the Contract because she chose not to enter it on account of its price-fixing provision prohibiting the participating anesthesiologists from charging fees that were higher than those charged in similar circumstances in like upstate New York communities. At trial, Konik eventually mentioned this provision as one of the terms of the Contract to which she had objected.[7] However, the record overwhelmingly indicates that this could not have been her reason for declining to enter the Contract. To begin with, Konik's testimony at trial made it plain that she simply did not wish to enter into any contract with the Hospital for the provision of services. When asked why she did not choose to sign the Contract proffered, she repeatedly answered, "I don't need a contract" (Tr. 335.); "I told my attorney I don't agree to a contract" (Tr. 605.); "I objected to a contract" (Tr. 610.); "The reason I didn't sign the document is because I did not need a contract" (Tr. 616).
 
 
 31
 The fact that Konik proffered her own version of an agreement does not detract from her repeated testimony that she simply did not want to sign any contract. She testified that she had made the Konik Proposal because it contained a provision allowing her to test whether or not she could be compelled to sign a contract in order to provide anesthesiology services at the Hospital. Thus, she interpreted the reservation-of-right clause as follows:
 
 
 32
 That says that if you are right and the corporation is right to tell me what I can do and that I have to sign a contract, then the Court will decide I have to sign a contract, and then this will all be settled, very simple. It was just a way to find out if I am compelled to sign a contract or not. Nobody else on the hospital staff has a contract except [AAP] in '78.
 
 
 33
 (Tr. 621-22.)
 
 
 34
 Most significantly, Konik's claim that she refused to sign the Contract because it contained an unlawful provision placing a ceiling on the prices the anesthesiologists were permitted to charge patients of the Hospital is squarely contradicted by her own contemporaneous actions and omissions. She did not tender the defendants an agreement that did not contain a price ceiling provision. And the Konik Proposal that she did proffer contained a price provision almost identical to the one in the Contract.[8]
 
 
 35
 In sum, assuming the jury were to find Konik's own testimony credible, and given the undisputable terms of the Contract she attacks and of the counter-offer she made, we must agree with the trial judge that "reasonable men could not arrive at" the conclusion that the defendants, through the Contract or otherwise, excluded Konik from the provision of anesthesiology services at the Hospital.
 
 
 36
 With this necessary factual predicate in mind, we turn to the evaluation of Konik's antitrust claims.
 
 B. The Tying Claim
 
 37
 The gist of Konik's claim of an unlawful tie-in is that the Hospital has power over operating room facilities in Clinton County and has tied those facilities to the anesthesiology services provided by AAP.[9] Konik contends that patients wishing to undergo operations in the Hospital are therefore forced to purchase their anesthesiology services from AAP, and that such an arrangement is per se unlawful under Sec. 1 of the Sherman Act. This claim was properly dismissed because the evidence failed to establish Konik's factual premise.
 
 
 38
 A tying arrangement may be per se unlawful under Sec. 1 if (1) there are two separate products or services, (2) there is a sale or agreement to sell one such product or service (the "tying product") conditioned on the purchase of the other (the "tied product"), (3) the seller has sufficient economic power in the market for the tying product to enable it to restrain trade in the market for the tied product, and (4) the arrangement affects a not insubstantial amount of interstate commerce in the market for the tied product. Fortner Enterprises v. United States Steel Corp., 394 U.S. 495, 497-98, 501-04, 89 S.Ct. 1252, 1255-1256, 1257-1259, 22 L.Ed.2d 495 (1969); see also Yentsch v. Texaco, Inc., 630 F.2d 46, 57 & n. 15 (2d Cir.1980). In light of the Supreme Court's recent ruling in Hyde, there seems little question that the Hospital's operating room facilities and the provision of anesthesiology service must be viewed as separate services. See --- U.S. at ---- - ----, 104 S.Ct. at 1562-1563. Further, it is clear that at least a jury question was presented as to whether the Hospital had sufficient economic power in the market for hospital operating facilities to enable it to restrain trade in the market for anesthesiology services. What was missing, however, was proof that the Hospital conditioned the sale of its operating room facilities on the purchase of anesthesiology services from AAP.
 
 
 39
 The record establishes rather conclusively that the Hospital did not so condition the sale of its operating room facilities. It does require--as it is undoubtedly permitted to do, see Hyde, supra, at ----, 104 S.Ct. at 1568--that patients using its operating room facilities purchase the anesthesiology services from an anesthesiologist who is permitted access to those operating rooms; but, while the Hospital has the "unquestioned right" to limit the number of anesthesiologists it will allow to provide such services, id., it has not limited that number to just the physicians who are members of AAP. As discussed in part II.A. above, the Contract, or one like it, was offered to Konik and at least one other anesthesiologist as well, on the same terms that were applicable to AAP; and it provided that other anesthesiologists granted staff privileges at the Hospital would be allowed to render services along with AAP. The import of the Contract is thus that a number of anesthesiologists, including Dr. Konik, may gain access to the Hospital's operating rooms; the Hospital will permit a patient to purchase anesthesiology services from any such person. The fact that Konik has chosen not to enter into an agreement with the Hospital that would have gained her access to the operating suites, and that no other anesthesiologist has yet been admitted to the Hospital staff undoubtedly produces the practical effect that patients have only the AAP anesthesiologists from whom to choose. But that is legally insufficient in the circumstances of this case to establish that the Hospital has tied its operating facilities to the services of AAP.
 
 
 40
 The circumstances in the Hyde case that led the Supreme Court to the conclusion that a tying arrangement existed there were different, since there was little question that the contract at issue in Hyde was exclusive. The hospital in Hyde "regard[ed] itself as committed to a closed anesthesiology department. Only Roux [& Associates] was permitted to practice anesthesiology at the hospital." Hyde, supra, at ----, 104 S.Ct. at 1555. Thus, the Court stressed that "[n]o anesthesiologists except those employed by Roux may practice at [the hospital]," id.; that "the hospital[ ] require[d] that its patients obtain necessary anesthesiological services from Roux," id. at ----, 104 S.Ct. at 1565, that "the actual effect of the exclusive contract" must be examined, id. at 104 S.Ct. at 1567; and it referred generally to "exclusive contracts such as the Roux contract," id.
 
 
 41
 It is plain that the failure of the record in the present case to support an inference that the Contract signed by the Hospital and AAP excluded Konik and other anesthesiologists significantly distinguishes the present case from Hyde. The evidence here was insufficient to establish an unlawful tie-in.
 
 
 42
 C. The Claims of Boycott and Section 2 Violations
 
 
 43
 For the same reason, Konik's claim that the defendants engaged in an unlawful boycott in violation of Sec. 1, and that AAP attempted and conspired to monopolize the market for anesthesiology services in Clinton County, must fail. Each of those claims is predicated upon a construction of the Contract as an exclusive dealing device that prevented Konik from rendering anesthesiology services at the Hospital. Thus, to establish the boycott claimed in this case, Konik sought to show that her competitors, the members of AAP, caused the Hospital to refuse to deal with Konik. Likewise, the monopoly-related claims turn on the supposed effort of AAP to see to it that Konik was denied the privilege of providing anesthesiology services at the Hospital. For the reasons discussed above, the evidence was insufficient to support a rational inference that the Contract, offered to Konik at parity with AAP, was designed to exclude her.
 
 
 44
 To the extent that Konik seeks to argue in addition that AAP had been shown to possess a monopoly of the provision of anesthesiology services in Plattsburgh from 1971 to 1978, because all anesthesiologists in Plattsburgh during that period were members and/or employees of AAP, the record again fails to support a claim that AAP violated Sec. 2 of the Sherman Act. In order for monopolization to violate Sec. 2, the defendant must not only possess monopoly power in the relevant market, but that power must have been acquired or maintained willfully, rather than having been acquired or maintained "from growth or development as a consequence of a superior product, business acumen, or historic accident." United States v. Grinnell Corp., 384 U.S. 563, 570-71, 86 S.Ct. 1698, 1703-1704, 16 L.Ed.2d 778 (1966). The trial testimony, including that of Konik, was consistent that during this period, there were no other anesthesiologists who wanted to settle in Plattsburgh.[10]D. The Claim of Vertical Price-fixing
 
 
 45
 Finally, we come to Konik's claim that the Hospital and AAP entered into an agreement vertically to set a maximum on the fees that would be charged by AAP for its anesthesiology services. The Contract provided as follows:
 
 
 46
 Fees charged by the parties of the second and third parts shall be no greater than those charged by other anesthesiologists for similar work situations in Upstate New York.
 
 
 47
 The district court found that "the quoted language by itself is not evidence of price fixing," and that Konik had "proffered not a scintilla of evidence in support of her vertical price fixing theory," 561 F.Supp. at 723, and it dismissed this claim on the ground that "any finding that defendants ha[d] combined to fix prices would be speculation at best," id. Although we believe the district court did not apply the proper legal standard in reaching its conclusion, we nonetheless conclude that the dismissal was proper on other grounds.
 
 
 48
 We assume that what the district court meant by its statements quoted above was that there was no evidence that the provision placing a ceiling on the prices to be charged by AAP had ever been adhered to or enforced. There was, for example, no evidence in the record as to what fees normally were charged in other upstate New York communities, or as to what fees AAP itself charged. Such a focus, however, misperceives the thrust of Sec. 1 of the Sherman Act. That section makes unlawful "[e]very contract, combination ... or conspiracy, in restraint of trade or commerce among the several States." The focus of Sec. 1 is the agreement or the combination. Such an agreement in restraint of trade need not be carried out in order for Sec. 1 to be violated. See, e.g., United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 224-25 n. 29, 60 S.Ct. 811, 844-846 n. 29, 84 L.Ed. 1129 (1940) ("it is ... well-settled that conspiracies under the Sherman Act are not dependent on any overt act other than the act of conspiring. It is the 'contract, combination ... or conspiracy in restraint of trade or commerce' which Sec. 1 of the Act strikes down, whether the concerted activity be wholly nascent or abortive on the one hand, or successful on the other.") (citations omitted). We think it clear that the term of the Contract that set maximum fees to be charged constituted evidence of a contractual vertical price restraint. See, e.g., Monsanto Co. v. Spray-Rite Service Corp., --- U.S. ----, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984). See also Arizona v. Maricopa County Medical Society, supra (horizontal agreement among hundreds of competing doctors to set maximum prices held per se unlawful).
 
 
 49
 This conclusion does not mean, however, that Konik's vertical price-fixing claim should not have been dismissed. A plaintiff who sues for treble damages under Sec. 4 of the Clayton Act not only must prove that the defendants violated that Act, but also must prove that her claimed injury was caused by the violation. See, e.g., J. Truett Payne Co. v. Chrysler Motors Corp., 451 U.S. 557, 562-63, 101 S.Ct. 1923, 1927-1928, 68 L.Ed.2d 442 (1981); Perkins v. Standard Oil Co. of California, 395 U.S. 642, 648, 89 S.Ct. 1871, 1874, 23 L.Ed.2d 599 (1969); GAF Corporation v. Circle Floor Co., 463 F.2d 752, 758-59 (2d Cir.1972), cert. dismissed, 413 U.S. 901, 93 S.Ct. 3058, 37 L.Ed.2d 1045 (1973). Our review of the record persuades us that this claim was properly dismissed because Konik had failed to present any evidence from which it could rationally be inferred that she was injured by reason of the inclusion of the price ceiling in the Contract.
 
 
 50
 As set forth in detail in Part II.A. above, the trial evidence overwhelmingly showed that the presence of the price ceiling was not the reason for Konik's declining to enter into the Contract with AAP and the Hospital. She included the same price provision in her own counterproposal. And she did not proffer an agreement that excluded the price term. Given the nature and clarity of the documentary evidence as to the terms to which Konik was expressly willing to agree if she had to sign any agreement, we conclude that no rational jury could have concluded that Konik refused to sign the Contract on account of its inclusion of the price ceiling term. Accordingly, Konik failed to prove that the asserted vertical price-fixing caused her injury, and her claim was properly dismissed.[11]
 
 CONCLUSION
 
 51
 The judgment of the district court is affirmed.
 
 
 
 [1]
 For purposes of historical discussion, we use "Hospital" also to include institutions that were the predecessors of the defendant Hospital
 
 
 [2]
 In addition to her antitrust claims, Konik asserted various other federal and state claims, which were dismissed in 1979 and are not at issue on this appeal
 
 
 [3]
 Although Konik argues in her brief on appeal that the court's earlier summary dismissal of the horizontal price-fixing claim was also improper, she has not taken an appeal from that ruling. Her notice of appeal stated only that she appealed
 from each and every part of the decision and order of the District Court (Honorable Roger J. Miner), rendered on the 2nd day of March, 1983 and entered in this action on the 3rd day of March, 1983: (1) In denying plaintiff's motion for directed verdict at the close of defendants' case; (2) Granting defendants' motion for directed verdict at the close of all the evidence, and (3) Plaintiff hereby appeals from each and every part of said order as well as the whole thereof.
 Thus, the correctness of the court's dismissal of the claim of horizontal price-fixing is not before us. Were we to reach the issue, however, we would agree with the district court that AAP, as a professional corporation whose members had pooled their capital and shared the risk of loss as well as the opportunities for profit, was a "joint venture[ ] [to be] regarded as a single firm competing with other sellers in the market." Arizona v. Maricopa County Medical Society, supra, 457 U.S. at 356, 102 S.Ct. at 2480. Konik's contention that there was no one with whom AAP, as a single seller, could compete was properly rejected. Obviously it could compete with Konik, who was not required to charge the same prices AAP charged; and the record was clear that there were other anesthesiologists who were potential entrants into the market.
 
 
 [4]
 We have in the past cautioned trial judges that it is preferable, "in the best interests of efficient judicial administration," to refrain from granting a motion for a directed verdict and instead to allow the case to be decided--at least in the first instance--by the jury. E.g., Mattivi v. South African Marine Corp., "Huguenot", 618 F.2d 163, 166 & n. 2 (2d Cir.1980). Pursuant to the recommended practice, if the jury reaches what the judge considers to be an irrational verdict, the judge may grant a motion for judgment notwithstanding the verdict. If this ruling is reversed on appeal, the jury's verdict may simply be reinstated. If, however, a verdict has been directed and that ruling is reversed on appeal, an entire new trial must be held
 We repeat our advice here. The trial in the present case consumed nearly four weeks. Had it not been appropriate to affirm, the district court, the jurors, and the parties would have needlessly been put to the trouble of another four-week trial.
 
 
 [5]
 If the terms of a proposed agreement were discriminatory, cf. Klors, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), a substantial question would be presented for the jury as to whether or not the agreement was exclusionary. Here, however, as discussed in the text, the Contract bears none of the indicia of a discriminatory or exclusionary device
 
 
 [6]
 The contract offered to Pang did not contain the provision for review by the parties every six months, and it provided that the fees of AAP and Pang would be "generally consistent with" those charged by other anesthesiologists in similar upstate New York situations
 
 
 [7]
 In answer to questions of what objections to the Contract she had voiced to the Hospital or AAP, and when she had voiced them, Konik responded as follows:
 A In August, in July when the document was in the process of being drawn up. There also were some clauses put in like--you only worked so-and-so much, and that takes it--well, the document was for the P.C., and Konik. That is the thing. There is nothing else supposed to come in or allowed to come in, nobody to Plattsburgh and practice anesthesia. This document says you have to have the same fees, what I objected to. It is my decision if I want to charge the patient and it is between me and the patient and me if he wants to pay for it or not to pay.
 (Tr. 337-38.)
 
 
 [8]
 The Contract provision reads as follows:
 Fees charged by the parties of the second and third parts shall be no greater than those charged by other anesthesiologists for similar work situations in Upstate New York.
 The Konik Proposal read as follows:
 The parties hereto agree that the fees charged by the parties of the second part and third part will be no greater than those charged by other anesthesiologists for similar work situations in Upstate New York.
 At oral argument of this appeal, Konik's counsel suggested that the reservation-of-right clause in the Konik Proposal had been inserted in order to allow Konik to challenge the price provision. The silent premise of this suggestion--i.e., that Konik had been unable to get the provision deleted--is not credible since, although Konik made a number of other counterproposals, there is no evidence that she proffered any agreement excluding the price provision. Certainly no reason has been advanced as to why she might have shied away from suggesting its deletion if she were troubled by it. In any event, counsel's interpretation of the reservation clause is contradicted by the record. The language of the reservation speaks only of Konik's "heretofore existing" claims, rather than of any claim arising out of obligations imposed by the agreement itself. And Konik testified that she viewed the reservation as "very simpl[y]" allowing her to test in court whether she was required to enter into any contract.
 
 
 [9]
 Konik asserts that she proved that Clinton County was the relevant geographical market and that interstate commerce was affected. Defendants have not taken issue with this contention
 
 
 [10]
 Konik, for example, testified as follows:
 Q Was anybody else providing [anesthesia service] during that entire period other than the group of anesthesiologists who were part of your partnership or corporation, one or the other?
 A There were no applications, nobody did come to town and wanted to stay.
 (Tr. 576.)
 
 
 [11]
 We have reviewed Konik's other substantive contentions and find them without merit. We find it unnecessary to address her claims of errors in the court's evidentiary rulings